## BALBAS v. UNITED STATES et al.

(Circuit Court of Appeals, First Circuit. April 5, 1919.)

No. 1342.

1. CRIMINAL LAW ⊜➾1129(1)—APPEAL—ERRORS ON FACE OF RECORD.

The Circuit Court of Appeals, in the exercise of its discretion, may notice a plain error on the face of the record in a criminal case, although not assigned.

2. INDICTMENT AND INFORMATION ⊜➾125(19)—DUPLICITY—ESPIONAGE ACT.

An indictment under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), alleging in one count that accused had caused and attempted to cause insubordination, etc., was not duplicitous, simply alleging two modes of committing one offense, especially in view of Rev. St. § 1024 (Comp. St. § 1690), relating to joinder of counts.

3. WAR ⊜➾4—ESPIONAGE ACT—ELEMENTS OF OFFENSE.

An indictment under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), charging the commission of the first offense set out therein, willfully making or conveying "false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies," must allege that statements made by defendant were false and willfully made.

4. WAR ⊜➾4—ESPIONAGE ACT—ELEMENTS OF OFFENSE.

An indictment charging a publisher with the commission of the second and third offenses set out in Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), need only allege that publications caused or were an attempt to cause insubordination, etc., or that they obstructed the enlistment or recruiting service of the United States, and that they were willfully made with such intent; it being immaterial whether statements in the articles were false or not.

5. WAR ⊜➾4—ESPIONAGE ACT—INDICTMENT.

Under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), where articles published by defendant were set forth at length in indictment, it was not necessary to specify particular statements in them by which it was alleged the defendant committed the offense with which he was charged.

6. INDICTMENT AND INFORMATION ⊜➾140(1), 150—SUFFICIENCY OF INDICTMENT —QUESTION FOR COURT.

In a prosecution under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), whether language used by defendant in newspaper articles was apparently adapted to create an offense became, on demurrer and a motion to quash, a question for the court.

⊜➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

257 F.—2

7. WAR ⊂⇛4—ESPIONAGE ACT.

A newspaper article, disclosing that the defendant, the publisher, as one of 288 residents of Porto Rico who had declined American citizenship, was opposing what he regarded as an unwarranted application of Selective Service Act (Comp. St. 1918, §§ 2019a, 2019b, 2044a–2044k) to them, *held* insufficient to show that defendant by its publication caused or attempted to cause insubordination, mutiny, disloyalty, and refusal of duty, or obstructed the enlistment or recruiting service of the United States, or that he intended so to do, under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c).

8. WAR ⊂⇛4—ESPIONAGE ACT—INDICTMENT—SUFFICIENCY.

A newspaper article, complaining of Selective Service Act (Comp. St. 1918, §§ 2019a, 2019b, 2044a–2044k), or constructions thereof by the provost marshal of the United States, *held* not so apparently free from language adapted or calculated to create insubordination, etc., or to obstruct the enlistment or recruiting service with the intent, etc., that court could have sustained a demurrer to counts of an indictment setting it forth as a violation of Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c).

9. CRIMINAL LAW ⊂⇛371(1)—ESPIONAGE ACT—PUBLICATIONS—EVIDENCE—PRIOR PUBLICATIONS.

In a prosecution under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), where the intent of the defendant by publication to commit the offense of causing or attempting to cause insubordination, etc., was one of the issues submitted to the jury, publications of the defendant in earlier issues of his paper were admissible in evidence to show that defendant had no unlawful intent.

10. WAR ⊂⇛4—ESPIONAGE ACT—PUBLISHING ARTICLES TO CAUSE INSUBORDINATION AND OBSTRUCT ENLISTMENT—ELEMENTS.

In a prosecution under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), it was not only necessary to prove beyond a reasonable doubt that the defendant willfully published newspaper articles with the intent to cause insubordination, etc., or to obstruct the enlistment and recruiting service, but also that this intent had been carried into effect by language adapted to produce these results.

11. WAR ⊂⇛4—ESPIONAGE ACT.

Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), in referring to the influencing and disloyalty, etc., in the military forces of the United States, should not be construed so broadly as to include the influencing of all the able-bodied men in Porto Rico, especially those who had renounced American citizenship, whether they were within the class who were obliged to register or not.

12. WAR ⊂⇛4—ESPIONAGE ACT—SUFFICIENCY OF EVIDENCE.

In a prosecution under Espionage Act June 15, 1917, tit. 1, § 3 (Comp. St. 1918, § 10212c), evidence *held* insufficient to sustain a finding that defendant published newspaper articles willfully, with the intent to create insubordination, mutiny, etc., or obstruct the recruiting or enlistment service of the United States.

Appeal from the District Court of the United States for the District of Porto Rico; Peter J. Hamilton, Judge.

Vincente Balbas Capo was convicted of a violation of the Espionage Act, and he brings error. Reversed and remanded.

Boyd B. Jones, of Boston, Mass. (Henry G. Molina, of San Juan, Porto Rico, on the brief), for plaintiff in error.

Thomas J. Boynton, U. S. Atty., of Boston, Mass. (Alonzo H. Garcelon, Sp. Asst. U. S. Atty., of Boston, Mass., on the brief), for defendants in error.

Before BINGHAM and JOHNSON, Circuit Judges, and ALD-RICH, District Judge.

JOHNSON, Circuit Judge. This is a writ of error to review a final judgment of the district court of Porto Rico, imposing a fine of $1,000 and imprisonment for the term of two years upon the defendant below, upon each of four counts in an indictment in which the defendant was charged with violation of title 1, § 3, Act of June 15, 1917, c. 30, 40 Stat. 219 (Comp. St. 1918, § 10212c), known as the Espionage Act.

There were six counts in the indictment. In the first and fourth counts the defendant below was charged with having committed the offense created by the first clause in the Espionage Act, viz.: The willfully making or conveying false statements with intent to interfere with the operation and success of the military and naval forces of the United States, to the injury of the United States. The fourth count was quashed upon motion of the defendant, and the jury returned a verdict of not guilty upon the first.

In the remaining four counts he was charged with committing the second and third offenses created by the following clauses in the act:

"And whoever, when the United States is at war, shall willfully cause, or attempt to cause, insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, * * * shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

In the second count he was charged with having committed the offense of causing and attempting to cause insubordination, etc., by "unlawfully, willfully, knowingly and feloniously publishing" in a certain paper or periodical, known as the "Heraldo de las Antillas," in the city of San Juan, Porto Rico, on or about the 27th day of October, 1917, certain false statements in the Spanish language, the English translation of which is as follows:

### "Recruiting in Porto Rico.

"According to recent notices, the quota of recruits of Porto Rico which had been fixed at 12,000 men has been increased to 17,000, of which the first ones will be white and the rest colored.

"It is said that the recruiting will begin within the first ten days of November next.

"We understand that Porto Rico contributes to the National Army proportionally a larger number of soldiers than any other state in the Union, and larger than any other territory, as, for instance, Hawaii, which does not contribute any.

"What do the politicians say to that, who attribute to themselves the monopoly of the defense of the people's interests?

"They say nothing.

"They are busy defending some positions that they have paid for."

It was alleged in said count that—

"The object and intent of the said words made, published and conveyed as aforesaid was to cause insubordination, disloyalty, mutiny and refusal of duty in the military and naval forces of the United States, * * * against the peace and dignity of the United States."

In the third count it was charged that he did—

"willfully, unlawfully, knowingly, and feloniously obstruct the recruiting and enlistment service of the United States, to the injury of said service and to the injury of the United States," by the same publication; and that "the object and intent of said words  *  *  *  was to obstruct the registration and enlistment in the service of the United States."

In the fifth count he was charged with having committed the offense with which he was charged in the second count, by the publication in the same paper, on or about the 10th day of November, 1917, of an editorial entitled "The Topic of the Day."

In the sixth count he was charged with having committed the offense with which he was charged in the third count, by publishing the same editorial. This was printed in the English language, and is set out in full in the indictment. It is too long to be quoted at length, and we will therefore quote only the material parts and state the substance of the rest. It began with the following quotation from another newspaper published in Porto Rico:

### "The Topic of the Day.

"The Prevost Marshall of the United States has decided that the Porto Ricans who have declined American citizenship are obliged to serve in the Army."                                                            La Democracia.

The writer then discussed this reported decision of the provost marshal:

"Just as it sounds, the above statement is exactly this: 'The Prevost Marshall has decided.' So that had the Prevost Marshall decided, contrarily, those who have not sworn American citizenship would not have been called to the 'colors'—or what has the same effect but in different words—that what one man decided is to be law for 288 men.  *  *  *

"With due deference to La Democracia, the Prevost Marshall has not the power to decide which affects man's conscience.  *  *  *

"The law reads that all citizens of the United States are obliged to active service, to take up arms; but it does not refer to those who are not American citizens. And should that law enact such a step, it would be nothing less than a law without foundation, because may La Democracia know, that Porto Ricans those who have not sworn allegiance to the American flag, we constitute a people of Porto Rico, as an entity about to disappear, may be, but not as yet extinguished.  *  *  *

"The people of Porto Rico has not declared war on any nation whatsoever and is therefore neutral. The above may sound awkward, but let it be known as a fact to all Porto Ricans, those who are now citizens of the United States, that Congress provided you with that citizenship in order that you be obliged to take up arms in defense of the American flag, without which privilege human conscience would have been violated had you been enlisted.

"It is logical, therefore, that in order that Porto Ricans be called to shed their blood for the American flag, they were given American citizenship, it is reasonable that those who have not sworn flag are not compelled to defend another but the flag of Porto Rico; that flag, that flies yet as the moral representation and symbol of the people of Porto Rico, who yet exists as a political body.  *  *  *  The flag does not wave lawfully over the castles of Porto Rico; but lives there—in the hearts of every Porto Rican,  *  *  *  those who have not sworn American citizenship.  *  *  *  No matter how powerful the foe may be, only for that dear flag would the sacrifice be offered.

"How little does it matter that the Prevost Marshall decides that the citizens of Porto Rico have to fight for the American flag—how little does he know that physical strength is not all ! ! !  The flag of a fatherland needs more

for its defense—it needs the spiritual embodiment of heart and soul that there may be strength, true force, to be able to strike the death blow to the enemy and proclaim victory."

The author then discussed the danger of a nation obliging men "as slaves to defend a cause for which they have no ideal," and states that it "sounds impossible that the Prevost Marshall could decide to engross the American army with men whose ideals are not the same as those of Americans," and that the people of Porto Rico, whom he calls "the Pariah," as the legal definition of a citizen of Porto Rico who has not changed his status, is neutral in this terrible war; that the Pariahs form a lawful entity, who have no governing power, and who have been compelled to allow themselves to be governed by others. Fate is appealed to behold them—

"weak and powerless, driven by force!!! That all has been decided by the Prevost Marshall, but he who thus decided, who thus presses on the defenseless and the weak, he who compels, based on might, that man be driven by force to fight for a flag that is not his own, he who thus drives man has no right to claim that man be a true, loyal soldier."

The defendant then stated his position and advice that he had given to those who like himself had declined American citizenship, under the provisions of the Act of Congress of March 2, 1917, c. 145, § 5, 39 Stat. 953 (Comp. St. 1918, § 3803bb):

"As soon as the statement of La Democracia was known, although no explanation of the decision of the Prevost Marshall was given, we, who have been so interested in the affair, have been the object of numerous inquiries on the matter from Pariahs all over the island and to one and all the same answer and information has been given:

"Resistance against the mighty is of no avail—when—ever called to the front—we have to go—but never before solemnly expressing to the Military Commission *that we are not citizens of the United States;* that we are not ready and willing to swear loyalty to the American flag—but if nevertheless we are compelled to defend a flag, to which respect is due, but with which we have no moral ties nor progeny—let the Prevost Marshall's will be done! His and only his will the responsibilities be of human error. And then may be that that decision find a place in the pages of history more due to its effects than to the motives of its existence. * * *

"Oh! Washington, be thou witness of this struggle; behold man's conscience trampled upon by Might; * * * behold the Statue of Liberty and the Right of Man cast to the winds in fragments."

The writer then reasons that, because the Pariah has been called upon to perform the same duties as citizens of the United States, his condition as a citizen "is equally esteemed and appreciated as that of President Wilson, inasmuch as the Pariah has been assigned the same and equal duties as those assigned to the President's fellow citizens," and therefore that the Pariahs are placed upon equal grounds and authorized to discuss as equals.

The defendant attacked the indictment by demurrer and a motion to quash on the following grounds: That the counts were improperly joined; that it did not set forth or allege the specific statements alleged to be false; that it did not set forth in any of its counts an offense known to the law or any violation of section 3 of the Espionage Act.

The demurrer was overruled and the motion to quash was denied.

except as to the fourth count, to which the defendant seasonably excepted. At the close of all the testimony the defendant filed a motion that the court direct a verdict of not guilty, and to the denial of this motion he seasonably excepted. The defendant also seasonably excepted to certain instructions of the presiding judge and the admission and exclusion of certain evidence, and has assigned these instructions and the rulings admitting or excluding this testimony as error. In addition, counsel for the defendant claimed in argument that the second and fifth counts were bad for duplicity, because the offenses of causing insubordination, etc., and attempting to cause insubordination, etc., are alleged in each of them, and that these are separate offenses, as shown by the disjunctive "or" in the statute; that while this objection was not urged at the trial, and is not made a part of the bill of exceptions, the error is apparent on the face of the record, and the court should take notice of it, although not assigned.

[1, 2] It is undoubtedly true that the court, in the exercise of its discretion, may notice a plain error on the face of the record, although not assigned; but we do not think the indictment is open to the charge of duplicity. Only one offense is alleged, which may be committed in two modes, and both of these modes are joined in one count. Either causing insubordination, etc., or the attempt, are different modes of committing one and the same offense and both may be alleged in one count. Crain v. United States, 162 U. S. 625, 634, 16 Sup. Ct. 952, 40 L. Ed. 1097; May v. United States, 199 Fed. 53, 117 C. C. A. 431; United States v. Dembrowski (D. C.) 252 Fed. 894.

The joinder of counts which the defendant assigns as error is authorized by section 1024 of the Revised Statutes (Comp. St. § 1690) and is fully sustained in Pointer v. United States, 151 U. S. 396, 400, 14 Sup. Ct. 410, 38 L. Ed. 208, and Ingraham v. United States, 155 U. S. 434, 15 Sup. Ct. 148, 39 L. Ed. 213.

[3, 4] As the indictment was drawn, there was an attempt to charge, in the first and fourth counts, the commission of the first offense set out in section 3; that of—

"willfully making or conveying false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies."

It was necessary to allege in these counts that the statements made by the defendant were false and willfully made. As to the last two offenses in the section, set out in the remaining counts, it is immaterial whether the statements made by the defendant were false or not; it was only necessary to allege that they caused, or were an attempt to cause, insubordination, etc., or that they obstructed the enlistment or recruiting service of the United States, and that they were willfully made with such intent.

[5] The articles published by the defendant were set forth at length, and it was not necessary to specify the particular statements in them by which it was alleged the defendant committed the offenses with which he was charged. Their language requires no expert knowledge for its interpretation, and no explanation was necessary by way of innuendo to make its meaning clear. Lockhart v. United States, 250

Fed. 610, 162 C. C. A. 626; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162.

[6] We think the offenses were set out in the indictment with such precision and exactness as to fully acquaint the defendant with the crimes with which he was charged. Whether the language which the defendant used was apparently adapted to create these offenses became, on demurrer and a motion to quash, a question for the court.

[7] The article of November 10th discloses that the defendant, as one of 288 residents of Porto Rico who had declined American citizenship, was opposing, as he was justified in doing, what he regarded as an unwarranted application of the Selective Service Act (Act May 18, 1917, c. 15, 40 Stat. 76 [Comp. St. 1918, §§ 2019a, 2019b, 2044a–2044k) to them. We do not think its language is adapted or calculated to effect the results which it was charged the defendant willfully intended. It is clearly only a justifiable criticism of the reported decision of a subordinate officer of the government by one who was directly affected by it, and we do not think that any inferences could reasonably or fairly be drawn from it which would justify a jury in finding that the defendant, by its publication caused, or attempted to cause, insubordination, mutiny, disloyalty, and refusal of duty, or obstructed the enlistment or recruiting service of the United States, or that he intended so to do, but that it discloses upon its face that his only purpose in publishing it was to oppose a reported decision by which those who had declined American citizenship would be forced to serve in the army of the United States. We think, therefore, the demurrer should have been sustained as to the counts which were based upon this publication.

[8] It is not so apparent from the language of the article of October 27th that it is not adapted or calculated to create the offenses alleged, or that there was an absence of willful intent, that the court could have ruled that there was no possible question for the jury in the determination of both the adaptability of its language to create insubordination, etc., or to obstruct the enlistment or recruiting service and the intent with which it was published, and we think the demurrer was properly overruled as to the counts based on this article.

The defendant assigned as error that the court refused to admit as evidence in his behalf an article under date of April 2, 1917, published by him in his paper, the "Heraldo de las Antillas," entitled "War," the material part of which is as follows:

"If Congress should enact—which would not be strange—compulsory service, which has been adopted in advance already by some states in the Union, then the moral support to be given by Porto Rico to the United States should take the form of soldiers not exempt from service, either by draft or by obligatory recruiting or by voluntary action. It is very natural that this should be so, Porto Rico being as it is already a part of the North American nation, enjoying her citizenship, and with the responsibilities and obligations which go with it. It is not the time to go back before the obligation of honor which has been contracted by all those enjoying American citizenship, and we would not be the persons to counsel disloyalty or treason. Consequently, with our principles of a lifetime, the man who has a flag should defend it with his arm, with everything and all that he is or possesses."

This article was offered by the defendant to show his state of mind and the absence of the intent with which he was charged in publishing the articles of October 27th and November 10th, and was clearly competent for that purpose. The court, however, excluded it, and assigned his reason for its rejection in the following language:

"I have admitted certain articles because they may throw light upon the intention of the defendant in this case. The allegations show that he has acted throughout in a propaganda to secure the independency of Porto Rico, but he gave that up when Congress passed the Jones Act. Now an article is offered which dates after the expiration of that propaganda, and an article— presuming for the moment that it is proper in some respects—that cannot throw any light upon that propaganda, does not come within the scope."

[9] The intent of the defendant to commit the offenses with which he was charged in the indictment was one of the issues submitted to the jury, and, as bearing upon that issue, publications of the defendant in earlier issues of his paper, which, in the exercise of its discretion, the court did not think too remote, were unquestionably competent, and we think the rejection of this article was prejudicial to the defendant.

[10] The defendant has also assigned as error certain instructions to the jury, but we do not find it necessary to consider all of them. The defendant points out the following which he claims is erroneous and which we think is material:

"If you have such a doubt in this case, then the defendant is entitled to it; but if, after considering the facts, you come to the conclusion as a reasonable man that there is one explanation, and one only, for what he did, and that is that he is guilty, that he did this intentionally, then you find him guilty."

We have looked at other parts of the charge to ascertain if the elements of the offenses with which the defendant was charged were clearly set forth, so that the instruction complained of, although erroneous, might be held not to have been prejudicial to him; but throughout the charge the presiding judge nowhere submitted to the jury the question whether the language of the statements was adapted to produce the results with which the defendant was charged. In summing up the elements necessary to constitute the offenses he stated to the jury:

"The principal ones are that he wrote these articles; that the first was false; as to the second, falsity is not necessary; that he published these articles in the way of which we have gone over, and that he did so willfully; that is to say, with an evil intent, not for the purpose of enlightening the public as to their rights and duties, but to interfere with the recruiting and enlistment of the military forces of the United States, and that he did it intentionally, intending to interfere and produce these different results."

In other parts of the charge the following instructions were given, to which the defendant seasonably excepted:

"He is indicted for publishing an article or articles with the intent that these articles would influence the different steps in raising the military forces, so that you do not have to go very far down the line to find out the elements of the case. You do not have to prove that the actual result of these articles was to interfere with the military forces; if the defendant published them with the intent to do that, then everything else follows; and that is what you will have to determine. * * *

"In other words, the freedom of the press is not a defense, if you think the defendant has done these things willfully and with the intent to obstruct the recruiting and enlistment of the military forces of the United States. * * *"

It was not only necessary to prove beyond a reasonable doubt that the defendant willfully published these articles with the intent to cause insubordination, etc., and to obstruct the enlistment and recruiting service, but that this intent had been carried into effect by language adapted to produce these results.

The emphasis which was laid by the court upon the necessity of finding the intent of the defendant and the direction of the inquiry of the jury to the determination of this, to the exclusion of any consideration of whether the language of the articles was calculated or could reasonably be held to be adapted to cause insubordination, etc., or obstruct enlistment or the recruiting service, and failure to instruct the jury that, whatever the intent of the defendant, it was necessary that they should find that it was coupled with some act or words adapted to carry it into effect, removed from their consideration the principal element of the offenses with which the defendant was charged.

[11] The defendant also excepted to this instruction and assigns the same as error:

"The indictment does not mean that it is necessary for you to find that this was intended to affect the troops in Cayey, Panama, or anywhere else. The act refers to the influencing and the disloyalty, etc., in the 'military forces' of the United States, and the military forces of the United States means the able-bodied men of the United States, the people from whom the United States may make up its army. It does not even mean those between the ages of 21 and 31 years; it means all able-bodied men of the United States and its territories, including Porto Rico. So, if you find that these articles were intended and are to be construed as affecting able-bodied men of Porto Rico, whether they are registered or not, or whether they are liable under the call, makes no difference; the military forces are the able-bodied men of this island."

The statute is a penal one, and while the military forces of the United States might be construed to include not only those who had been inducted into the military service, but also those who had been required to register under the Selective Service Act and had not been exempted or excused from service, we do not think it could be construed so broadly as to include all the able-bodied men in Porto Rico —the 288 Porto Ricans who had renounced American citizenship among them if they were able bodied—whether they were within the class who were obliged to register or not.

While we think these instructions cannot be sustained and that they were prejudicial to the defendant, we feel also that there was error in denying the motion, made by him at the close of all the testimony, that the jury be instructed to return a verdict of not guilty.

We have examined with great care both statements which the defendant admits he published in his paper, and also the testimony introduced by the government and by the defendant, and we are unable to discover any evidence upon which the finding of the jury, that he willfully published either article with the intent to create insubordination, disloyalty, mutiny, or refusal of duty in the naval or military

forces of the United States, or to obstruct the enlistment or recruiting service of the United States, can be sustained. The only evidence which the jury had before it beside the two articles was the testimony of two employés in the Post Office Department, who testified in regard to the mailing and circulation of the papers in which the articles were contained, which was admitted by the defendant, and the testimony of the adjutant general of Porto Rico, who testified that the article which appeared in the defendant's paper under date of October 27th, entitled "Recruiting in Porto Rico," was not true; that the quota to be furnished from Porto Rico was 12,833, and that he had not at any time received from his superiors any further orders in regard to the quota of men which was to be supplied in Porto Rico; that at the time of the trial no men had been drafted in Hawaii for service, and while the gross quota of men to be supplied by Hawaii for the National Army was 2,403, it had actually furnished 4,397 men. He was shown a copy of "La Correspondencia," a newspaper published in Porto Rico, and admitted that the figures given by that paper in its issue of July 20, 1917, showing the number of men to be furnished by the different states of the Union, Porto Rico, and Hawaii, were correct in accordance with the official records in his office.

The defendant testified that he was born in Porto Rico; that he served in the Spanish War upon the side of Spain, and that after the treaty of Paris he had opposed compulsory American citizenship for Porto Ricans until the enactment by Congress on March 2, 1917, of legislation conferring citizenship upon residents of that island; that upon March 7th, after the passage of the act, he had declared his intention of not becoming a citizen, in accordance with its provisions that those who did not desire to become American citizens might file a declaration of their rejection of the offer of citizenship in the United States District Court of Porto Rico. In the "Heraldo de las Antillas" of March 20, 1917, he stated his reasons for his action. This article and another in the same paper, under date of March 31, 1917, were admitted in evidence. In these articles the defendant stated that he did not have the attachment for America as a nation to make it proper for him to become an American citizen, and that—

"To make a display of American citizenship without entertaining a proper feeling of loyalty to the American flag would not only create a disagreeable predicament, but would also constitute the most pronounced betrayal of personal convictions and the most utter disregard of personal decorum."

He also stated in the article of March 20, 1917, that those who have accepted American citizenship—

"are under positive obligation to be loyal to that citizenship and to that flag."

A publication of the defendant in his paper, under the heading "Topic of the Day," under date of October 13, 1917, was also admitted in evidence, which contains the following statements:

"According to every indication, the moment is nearing for Porto Rico to begin paying its tribute of blood to the American flag. New instructions have been issued in the daily press—and by the way they are not very clear, thanks to the very poor Spanish in which they are written or translated—

and in such instructions the fact of not being citizens of the United States is also omitted as ground for exemption. * * * There is no doubt, however, that the matter is to be brought very shortly and that it must be solved in one way or another. As for us—we repeat it once and one hundred times— we have no doubt whatever; but it is also known that in these times the least doubtful things seem dark and adulterated. We believe that the citizen of Porto Rico who accepted the citizenship of the United States, inasmuch as he was given six months within which to renounce it, is inevitably bound to take up arms to defend his nation. There was not the least deceit in it. except such difficulties as were interposed by some officials to prevent the renunciation of such citizenship, the period of time fixed by law for the exercise of that right having transpired precisely during the time that the Congress of the United States established compulsory military service and was making preparations to carry the same into practice. * * * Then and now we showed ourselves respectful to the wishes of each and everybody, and now that the time within which to exercise the right of renunciation has more than expired, we must continue to show the same respect; and even from our own standpoint we must acknowledge and proclaim that those Porto Ricans are bound to accept all the consequences of their action as such citizens of the United States. But just as we are of the opinion concerning those who accepted the citizenship of the nation whose flag waves to-day over the castles of our country, we understand, and we shall not tire repeating it until this question shall have been duly determined, that no person who is not a citizen of a nation can be a soldier of that nation unless it is done through an act of force against which it is always lawful to claim as long as such claim is made in a legal way and before the same Congress which provided the right to renounce American citizenship."

These articles show that the defendant had been engaged in a controversy over the desirability of the residents of Porto Rico accepting American citizenship, which was conferred upon them by the Jones Bill, so called, and that after the six months had expired in which citizenship might be renounced under the provisions of the bill, he had been discussing the rights of those who had so renounced the offer of citizenship; that 287 other residents of Porto Rico beside himself had, under the terms of this act, renounced this citizenship; and that, whether he and these 287 associates were subject to the provisions of the Selective Draft Act, was a matter of great interest to him and the subject of discussion through the columns of his paper. The attitude of the defendant toward American citizenship and his published statements in regard to the duty which Porto Ricans owed the American flag who had become American citizens, throw light upon the intent with which the defendant published the articles upon which the indictment against him was found.

The defendant testified that, after the passage of the Jones Bill, he ceased the publication of his paper as a daily on May 17, 1917, and continued its publication as a weekly with the principal object of defending the rights of those who had renounced American citizenship, taking his news from local papers, as his paper had no news service of its own. That, in publishing his article of October 27, 1917, he had before him an article in the issue of October 20, 1917, of the "La Correspondencia," another newspaper published in Porto Rico. This article, entitled "The Draft in Porto Rico," was admitted in evidence. It stated in substance that, according to latest official authorized advices, 17,000 men would be recruited in Porto Rico, instead of 12,000, as had been previously reported, and that it was the purpose of the

government to draft 12,000 white men and 5,000 negroes or colored men; that the latter would be sent immediately to the United States to a suitable cantonment for men of that race, and the 12,000 white men would be trained in Porto Rico; that this had not yet been decided, but that the news in detail would be given soon; and that, if this project was finally adopted, Porto Rico would be contributing many more men than was set at the beginning.

He testified that he had before him, also, in the preparation of his article an article published in the "La Correspondencia" on July 20, 1917, which gave the number of men to be furnished under the draft by each state and territory, and concluded with this statement:

"As may be seen by our readers from the list we are publishing, the quota of Porto Rico, as a blood tax, to be a part of the first National Army, is 12,833 men; that is, it occupies the place designated with No. 22 among all the states and territories, being over 29 states and territories whose quota of men for the defense of the great American nation is much smaller."

While the statements contained in these articles in "La Correspondencia" were incorrect, and that of July 20, 1917, failed to take into consideration that the number of men assigned to the different states was the net number to be drafted after the number who volunteered had been deducted, there was no evidence that the defendant knew such to be the fact or was in any position where it might be said that he should have known the facts. It did appear in this statement that Hawaii would furnish no men, and that Porto Rico would furnish a larger number of men than 29 states and territories, although the population of these states far exceeded that of Porto Rico, on the assumption that Porto Rico would furnish 12,833 men. The article of October 23, 1917, from "La Correspondencia," stated that the draft, from officially authorized advices, would be raised to 17,000 men. These articles were admitted in evidence to meet the charge that the defendant had an evil intent in making the statements with which he was charged. In the light of the evidence afforded by them, we do not think that any construction can be placed upon the article of October 27th that would sustain a finding that it was willfully published with the intent to cause insubordination, etc., or to obstruct the recruiting or enlistment service. It was clearly in the nature of a criticism of the conduct of those who were charged with the duty of protecting the citizens of Porto Rico, and seeing that they were not unfairly discriminated against under the Selective Service Act, because he asks:

"What do the politicians say to that, who attribute to themselves the monopoly of the defense of the people's interests? They say nothing. They are busy defending some positions that they have paid for."

There was no evidence before the jury to show the intent with which the defendant published this article, except the language of the article itself and the testimony of the defendant in regard to the sources of information which he had for it, and this was not only uncontradicted, but was supported by the testimony of the government that the articles in "La Correspondencia" were actually published in that paper, and also the uncontradicted testimony of the defendant in regard to the prior publications in his own paper.

[12] We think there was no evidence to sustain the verdict of the jury that the defendant published either the article of October 27th or that of November 10th willfully, with the intent to create insubordination, mutiny, etc., or to obstruct the recruiting or enlistment service of the United States, and that the defendant's motion to instruct the jury to return a verdict of not guilty should have been granted.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion.