UNITED STATES v. AULT et al.

(District Court, W. D. Washington, N. D.   January, 1920.)

No. 4928.

1. CONSPIRACY ⊚⇒27—OVERT ACTS NEED NOT CONSTITUTE A CRIME.
    That overt acts charged in an indictment for conspiracy under Cr. Code, § 37 (Comp. St. § 10201), do not constitute an offense or are insufficient to effect a crime is not an objection if they tend to effect the object of the conspiracy.

2. CONSPIRACY ⊚⇒43(12)—CRIMINAL LAW ⊚⇒371(1)—OVERT ACTS MUST BE PROVED AS LAID; OTHER ACTS ADMISSIBLE TO SHOW INTENT.
    Overt acts charged in an indictment for conspiracy must be proved as laid, and proof of other similar acts may be considered only as showing intent.

3. INDICTMENT AND INFORMATION ⊚⇒150—SUFFICIENCY OF OVERT ACTS ALLEGED MAY BE CONSIDERED ON DEMURRER.
    Where an indictment for conspiracy sets out the plan of the conspirators, an averment that the overt acts alleged were for executing such conspiracy does not preclude the court from determining on demurrer whether or not they tend to effect its purpose.

4. CONSPIRACY ⊚⇒43(5)—INSUFFICIENCY OF INDICTMENT.
    An indictment charging in different counts conspiracy to violate the several provisions of Espionage Act, § 3, as amended by Act May 16, 1918, c. 75, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), held insufficient in that the overt acts charged did not tend to effect such violation.

Criminal prosecution by the United States against E. B. Ault, George P. Listman, F. A. Rust, Anna Louise Strong, and the Seattle Union Record Publishing Company, Inc. On demurrer to indictment. Sustained.

Robt. C. Saunders, U. S. Dist. Atty., of Seattle, Wash.

John F. Dore and Mark M. Litchman, both of Seattle, Wash., for defendants.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

NETERER, District Judge. The indictment, under seven counts, charges conspiracy, under section 37, P. C. (Comp. St. § 10201), to violate certain subdivisions of section 3 of the Espionage Act (section 10212c, Comp. St. 1918, Comp. St. Ann. Supp. 1919).

Count 1 charges that the defendants—

"continuously, throughout the period of time from May 17, 1918, to the presentation of the indictment, * * * conspired * * * to commit an offense against the United States, to wit, * * * obstructing the recruiting and enlistment service of the United States when the United States was at war, * * * by means of personal solicitations, and * * * speeches, * * * articles, stories, editorials, * * * published in * * * the Seattle Union Record, circulating * * * among persons * * * eligible * * * and fit for recruiting and enlistment in the military and naval forces of the United States. * * * "

Nineteen overt acts are set out to effect the object of the conspiracy, all being publications in the Union Record. The first act is dated November 18, 1918, and the last act dated November 27, 1919. The other acts, January 24, February 4, June 2, 26, 28, 30, September 8, 10, 13, 18, 27, and November 11, in 1919.

Concisely stated, the remaining counts, in the same language, charge:

2. The use of—

"scurrilous and abusive language about the form of the government of the United States, the Constitution, * * * the flag, * * * the uniform. * * * "

3. The use of language intended to bring the form of the government, the Constitution, the military and naval forces, the flag, and the uniform into contempt, scorn, contumely, and disrepute.

4. The use of—

"language intended to incite, provoke, and encourage resistance to the United States," "by pretending * * * to advance the interests of laborers as a class, and giving them complete control and ownership of all property and of the means of producing and distributing property through the abolition of all other classes of society (by the said defendants, their associates and confederates), designated as 'capitalists,' 'the capitalistic class,' 'the master class,' 'the ruling class,' 'exploiters of the workers,' 'bourgeois,' such abolition to be accomplished not by political action, or with any regard for right or wrong, but by the continual and persistent use and employment of unlawful, tortious, and physical means and methods involving threats, assaults, injuries, intimidation, and murder upon the persons, and the injury and destruction (known to said defendants and their said confederates and associates as 'sabotage,' 'direct action,' 'working on the public,' 'wearing the wooden shoes,' 'working the sab cat,' and 'slowing down tactics') of the property of such other classes, the forcible resistance to the execution of the laws of the United States, and the forcible, revolutionary overthrow of existing governmental authority in the United States, use of which said means and methods was to accompany and to be accomplished in part by local strikes, industrial strikes, and general strikes of such laborers, and use of all which said means and methods was to be made in reckless and utter disregard of the rights of all persons not associated with, or in sympathy with, the said defendants and their said purposes * * * and depicting as heroes and martyrs, Kate O'Hare, Eugene V. Debs, Hulet M. Wells, William D. Haywood, * * * referred to * * * as 'political prisoners,' which said crimes included the offenses of seditious conspiracy, and * * * violation of * * * the Espionage Act and other conspiracies to commit offenses against the United States."

263 F.—51

5. Repeats charges in 2, 3, and 4; and to promote the cause of its enemies; curtailment in essentials to the prosecution of the war.

6. To support Germany and Austria-Hungary, the countries with which the United States was at war.

7. To violate section 211 of the Penal Code (Comp. St. § 10381) by sending through the mail printed matter "of a character tending to incite arson, murder, or assassination."

The defendants have demurred to each count on the ground that sufficient facts are not stated to constitute a crime; that neither of the overt acts has a tendency to effect the object of the conspiracy charged; that each of the overt acts was committed after actual hostilities in the World War ceased; that the indictment fails to set forth "the certain seditious statements, articles, editorials, headlines, and printed matter calculated and intended by the defendants to accomplish the purpose therein charged"; that the Espionage Act is unconstitutional and violative of the First Amendment to the Constitution.

The constitutional objections are disposed of by the Supreme Court in Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470, and in Debs v. U. S., 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566. All of the other contentions can be disposed of together.

The charge in the several counts in the indictment is as broad as language can make it, and is limited only by the provisions of the Espionage Act, to violate which it is charged the conspiracy was formed. Section 37, supra, provides that "if two or more persons conspire to commit an offense against the United States, * * * and one or more * * * parties do any act to effect the object of the conspiracy, each of the parties * * *" shall be punished.

It has been uniformly held that to offend against a law of the United States is to offend against the United States. The gravamen of the crime charged is the conspiracy. At common law the crime was completed when the conspiracy was formed, and it was unnecessary to state the particular means by which the object was to be carried forward; the felonious intent being charged, the means to effect the enterprise was a matter of evidence upon the trial; the bare combination and agreement constituted the crime. 2 Bish. Criminal Practice, §§ 207–8; 2 Bish. Cr. Law, 171–5; 191–3–8. Section 37 requires more than the mere agreement before the combination is brought into operative effect (Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90), and that is the overt act. Only one overt act need be established. Jones v. U. S., 179 Fed. 584, 103 C. C. A. 142; U. S. v. Cassidy (D. C.) 67 Fed. 698; U. S. v. Burkett (D. C.) 150 Fed. 213. The object of the statute in requiring an overt act is to afford a locus penitentia, giving opportunity for meditation and abandoning of the enterprise (U. S. v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698; Hyde v. Shine, supra); nor is it necessary that the conspiracy should be successful (U. S. v. Cohn [C. C.] 142 Fed. 983; U. S. v. Curley, 130 Fed. 4, 64 C. C. A. 369). The vitalizing agency is the overt act to effect its object.

The contention that the indictment should set out the whole story, etc., is not well taken. It is well covered.

Chief Justice Fuller in Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, said—

"that when the criminality of the conspiracy consists in an unlawful agreement of two or more persons to compass or promote some criminal or illegal purpose, that purpose must be fully and clearly stated in the indictment; while if the criminality of the offense consists in the agreement to accomplish a purpose not in itself criminal or unlawful, by criminal or unlawful means, the means must be set out."

[1, 2] The several counts in the indictment specifically state that the unlawful enterprise was to be effected through printing, publishing, speaking, etc., as set out in count 1. As to the objection that the overt acts set out are not an offense, and that they are insufficient to effect the crime, it may be said an innocent act, if wrongfully related, may serve the purpose of an overt act, if it tends to produce, to cause, to execute, to enforce, achieve, accomplish, or bring to pass the object of the conspiracy, which is a matter of proof, on the trial. In this case, however, each overt act set out consummates the plan, and, if offensive, is a completed crime, and, if not offensive, no crime is committed. If, as stated at bar, in argument, there are many more publications, such publications would not be a step or link in the chain which would effect, achieve, or accomplish the criminal conclusion of the charge, and could not be considered as overt acts. Overt acts must be proved as laid in the indictment. U. S. v. Newton (D. C.) 52 Fed. 275, at page 285. The other publications can only be considered to show intent as to the charges in issue.

The indictment is comprehensive, and ingeniously drawn, and, by general terms, in nearly every count the whole of section 3 of the Espionage Act is covered, but in each count reference is made, by specific statement, to parts of the section, and under the rule ejusdem generis the statement in each count must be held to that specifically enumerated, and from which appear the charges as stated.

[3] It is not fatal to charge conspiracy to commit two or more offenses. Frohwerk v. U. S., 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561. The serious question for decision in this case is: Shall the court consider the legal sufficiency of the overt acts, or is the statement that they were overt acts for "executing said * * * conspiracy * * * as charged" sufficient? The government contends that is a matter for the jury. I am familiar with authorities so holding. The record in these cases distinguishes them from the facts here. There is no question, I think, if, after all of the evidence is presented, there is no testimony showing an overt act charged to have tended to effect the object of the conspiracy, the duty to direct a verdict of not guilty would be plain. If no act to effect the crime is shown by the indictment, the plan being set out, as here, I think it is likewise the plain duty of the court to so determine. U. S. v. Biggs (D. C.) 157 Fed. 264; U. S. v. McLaughlin (D. C.) 169 Fed. 302; U. S. v. Greene (D. C.) 115 Fed. 343. The rule of strict construction applies, and effect must be given to all parts of the statute, and the whole record on demurrer to the indictment must be considered. U. S. v. Watkins, 228 Fed. Cas. page

419, No. 16649. Without an act to "effect the object" no offense appears.

"Effect," (n.), is defined by Webster as: "1. Execution; performance; realization; operation. * * * (v. t.), 1. To produce, as a cause or agent; to cause to be. 2. To bring to pass; to execute; to enforce; to achieve; to accomplish."

The Standard Dictionary defines "effect," (v. t.), "To be the cause or producer of; bring about, especially to bring to an issue of full success; accomplish; achieve." "Effect," (n.), "The result or product of some efficient cause or agency; a consequence or outcome."

The pleader had this conception in mind, for he says for executing the felonious design the certain acts were done. An act, then, which would not have a tendency to produce, cause, execute, enforce, achieve, accomplish, or bring about the unlawful enterprise, would not be an overt act; and where the completed plan and act are set out, as here, I think it is the duty of the court to consider and determine whether an offense is stated. A court or a jury has no more right to draw inferences from facts that do not necessarily and legitimately authorize such inference than to find any other fact without evidence. Von Bank v. U. S., 253 Fed. 641, 165 C. C. A. 267. The duty, then, is to determine from the acts set out, if the plan, as here, is completed, the legal effect with relation to the charge, and at the first challenge. Chief Justice Marshall, in U. S. v. Wiltberger, 5 Wheat. 76, 95, 96 (5 L. Ed. 37), said:

"The rule that penal laws are to be construed strictly is perhaps not much less old than construction itself * * * to determine that a case is within the intention of the statute its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of the statute is within its provision, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated."

With equal force does this apply if the facts stated in the indictment do not bring it within the statutory requirements. If completed acts, separately stated, are not crimes, many may not be united in a conspiracy charge as overt acts, and made criminal.

[4] This is a government of laws, under the Constitution, administered by men selected from the citizenry of the United States, and all persons charged with crime stand unprejudiced by the passions of the times. Von Bank v. U. S., supra. In U. S. v. Strong, 263 Fed. 789, and U. S. v. Listman et al., 263 Fed. 798, we held that overt acts 3, 8, 13, 14, and 18 do not offend against the law.

Act 1 purports to be a report of—

"the Socialist peace celebration." * * * "Even from a capitalist class standpoint it was a harmless meeting," says the report; and further says that "Lenine and Trotsky were cheered to the echo." And, "The customary plea was made for funds to start a daily newspaper." "'We have met to celebrate the coming of peace and the beginning of the revolution,' declared Wells. 'They want us to go up against their bayonets in defense of a piece of red bunting,' he cried, referring to Congressman John F. Miller's inflammatory speech denouncing the red flag at a recent meeting of the Chamber of Commerce. 'Well, we are not going to do it. That same red flag stands only for an idea; an idea which (they) cannot kill with their bayonets, and they know it. That is the reason they fear it. The history of the revolution is the history of the working class.'"

### "Meeting of Revolutionists.

"T. F. G. Dougherty, speaker of the Industrial Workers of the World, followed Wells. 'Some have called this a peace meeting,' he said; 'I deny it. This is a meeting of revolutionists. The capitalist press has howled that we have taken advantage of the war won by "their soldiers" to spread revolutionary propaganda. They say that we only fight by propaganda. What a tribute to pay to a peace loving working class, to declare that we fight with logic and reason rather than with guns and bayonets!'"

Two has relation to the labor convention at Chicago. Among other things it states:

"I saw a thousand souls
Of petty individuals
Become *one great soul,*
The great united spirit
*Of labor*
Cheering for Debs,
Hailing with joy
The workers of all countries,
And rising at last
With one inevitable about
To vote a *general strike*
For *human freedom."*

And again:

"We voted the *strike*
And *that* is revolution!
But I shall never forget
The *soul* I saw born
And *die* in that convention.
And I know at last
Neither by *hunger*
Nor by *revolt*
Nor by the cry for *justice*
Shall the *new world* come,
But only when *all* of these
Shall bring to birth
Out of the Jangling pain
Of warring individuals,
The one *great spirit of man*
Moving
To *one great goal."*

Four: A criticism of Spokane in voting against the "Mooney Strike," calling the Spokane unions traitors, and declaring that Washington, Lincoln, John Brown, Paul Jones, and Paul Revere, and Garrison, were rebels, and concludes: "Shame on any labor council that deserts its brothers in the time of need." And reports the vote of the various unions in support of the Mooney strike.

Five has reference to Mooney and Billings, and continues:

"Class-conscious workers who understand the rotten capitalist system are not in the least surprised at all this, for their reading of working class history from ancient to modern times, and by applying the historical method of interpretation of events, clearly demonstrates that violence, calumny, misrepresentation, cruelty, injustice, ad finitum, are old, very old, allies of the despoilers of humanity—the exploiting profiteers.

"The question of the hour is not to recall the awful past, not to whine about all the countless cruelties and injustices inflicted on us, not like beggars to plead for mercy, but instead to rise up in our righteous wrath and abolish

forever all classes, all exploitation, all coercion and parasitism. This can only be accomplished by intelligence, organization, and determination.

"Only one power on earth can free Mooney and the other victims of capitalist class hate, and that is the aroused working class."

And then quotes a part of an address delivered by Robert Smillie, president of the British Miners' Federation, at a celebration at Lanarkshire, Scotland, quoted from the British Columbia Federationist:

" 'I am not out to preach contentment *until we have reason to be content.* Dukes, marquises, earls, and capitalists are entitled to be content; but people who are landless, people who live in slums, and people who are dispossessed *have no right to be content.*

"I am out to rouse our people to some sense of the dignity of their manhood, and they have no right to be content so long as they have only the material things which are necessary to keep life going. It is not right or true to say that I am out to create rebellion or bloody revolution *if that can be avoided.* I am out to show our people that it is their business to *unite by constitutional means—if possible—to overturn the present system* in order to enable the whole of the people to live *brighter and happier* lives than they live at the present time.' "

And the article concludes:

"Don't forget the big Mooney Dance next Friday night at Dreamland, June 27."

Six treats of the Mooney strike July 4th, and concludes:

"Mooney is 'only a working man,' it is true; but the workers have come to a realization that when one of their number is discriminated against their entire class is injured—and they have determined to put a stop to it."

Seven: An article with relation to the Mooney strike and power of the press, in which appears:

"The last time Old Man Majority bossed the show was away back in the days of *primitive communism,* the particular form of society that prevailed before rival hostile classes evolved from the terrible institution of *private property* in the means of life. Some wag once said: 'Give me control of the newspapers of the United States for six months and I'll elect Jack Johnson or Hinky Dink president, or any one else.' And it is true, ye gods!

"The average man in this country to-day could not tell you, to save his life, why he voted for either the Republicans or Democrats. The citizen voter was not consulted about the war, about conscription, or anything else.

"He never is, and it is not intended by his masters either that he should be.

"As public sentiment is carefully *manufactured* by the agents of plutocracy via the press, pulpit, platform, and picture route, and as therefore the vote is by no means a clear or true expression of the *real* needs of the working class —seeing that it was palpably manufactured at the instigation of the crafty minority—it therefore becomes a huge joke to talk of the 'people' ruling."

And continues with an argument in behalf of the Mooney strike, and concludes:

"Secretaries of all local unions are requested to kindly send in the tabulated vote of their respective unions on the Mooney Fourth of July strike to room 14, Labor Temple."

Nine is an appeal for deposit of Liberty Bonds, securities, or some available means to secure bonds for "members of the I. W. W. now confined in jails and penitentiaries throughout this country."

Ten: This is a report of a meeting addressed by "Robert Minor,

world famous newspaper correspondent, cartoonist," before "a crowd of 3,000 people, assembled in mass meeting at Fourth and Virginia Sunday afternoon. * * * The collection amounted to $283.77."

Eleven: Report of meeting addressed by Robert Minor, and excerpts from the address, and a line reference to some local citizens.

"J. C. Mundy, president of the Central Labor Council, acted as chairman of the meeting, and introduced a telegram addressed to Eugene V. Debs, Thomas J. Mooney, and Hulet M. Wells, imprisoned leaders of the American working class, which the crowd adopted after a roar of demand that 'Bill' Haywood, I. W. W. leader, be included. The telegram, signed by Mundy and J. A. McCorkle, chairman of the committee in charge of the mass meeting, read:

" 'Six thousand citizens of Seattle in meeting assembled send this expression of their gratitude to you for your loyalty to the working class, which is the sole occasion for the terrible suffering now being inflicted upon you. Courage, brother! We pledge ourselves not to rest until you and every other champion of labor are released.' "

Then follow quotations from Minor's address, describing conditions in Russia.

Twelve:

"President Wilson is quoted in yesterday's press reports as saying at Helena, Mont., 'that a strike of policemen of a great city, leaving that city at the mercy of an army of thugs, is a crime against civilization. * * *' "

And further:

"The Union Record maintains, and the American Federation of Labor, to which the Union Record is proud to belong, maintains that public servants have the same desires, the same needs, and the same rights as private servants, and that in bettering their conditions of labor and pay they are compelled to resort to the same methods in dealing with governments as employers as they do in dealing with private employers. It is unfortunate, sometimes, for the general public that this is so; but it is no fault of the workers involved, and those who loudly demand that policemen be refused the right to organize might better be engaged in devising some method by which public servants may secure an approximation to justice in some other manner."

And concludes:

" 'It is a crime against civilization'—but the policemen are not the guilty parties—and we hope that the lesson 'will be burned in so that it will never again be forgotten.' "

Fourteen is a discussion of "Middle-Class Stupidity," in which appears:

"You merchants, business men, and bankers, hurling your calumny and vituperation at co-operation and other revolutionary movements, are destined to be rudely jolted. You do not realize it, perhaps, but the world is in the throes of a working-class revolution. Bolshevism has not far to cross the Atlantic, and your cupidity and stupidity have created a marvelously fertile field for its growth. Co-operation is one of the gentler means of escape from a revolution of blood and carnage. If you neglect this opportunity to help construct the machinery that will enable the United States to make a bloodless transition from capitalism to the Co-operative Commonwealth, you will pay the penalty in loss of life and destruction of property. The American people are patient— too patient—but they cannot always be patient. The burdens of living cannot increase indefinitely. An explosion is bound to occur.

"Revolution in America? 'Impossible!' you say. Not at all, my dear sirs! A year ago every newspaper in the land smiled incredulously at the sugges-

tion of a revolution in Germany. But it happened! You thought Germany too highly organized and too imperialistically educated for revolt. * * *

*"You sneer—you laugh, or, perhaps reluctantly admitting the possibility of revolution, you mouth some glib talk about suppression of discontent and agitation.* That is precisely the way a certain Louis purled before his head gorily decorated a pike. * * *

*"Revolution is inevitable—you must face it whether you relish it or not.* * * * You will very probably hug your ill-gotten gains. Throughout history your class have preferred that method. Tyranny and oppression rarely abdicate. *It appears that the world is periodically forced to cleanse* itself in blood.

"But miracles are said to happen. Is small and big business in America to see a little beyond its profits?"

Fifteen is an appeal for funds and collateral to provide bail for the release of prisoners in custody, marked "(Advertisement)."

Sixteen is a communication by "Press Committee," criticizing the treatment of Hulet M. Wells by the warden of a penitentiary, among other things:

"This is the fate of one of your brothers, a member of your class. One who has deliberated with you in your unions; counseled with you in your assemblies; toiled with you' and struck in your strikes. This is Hulet M. Wells, the worker, who, having realized his class position, stood with his principles. Strong and determined, made of the stuff that will yet rid the world of bloody misery that afflicts it, yet he is sinking, sinking under the brutality of callous servants whose minds have been twisted by a slave system of society. * * *

"What are you going to do? There are 60,000 of us organized in Seattle. Does this organization count for naught? Come, we have our hands on the levers of industry; let us take them off. It is our energy that creates wealth. Withdraw it. Rest. * * * It is our class duty. The world will never be a decent place to live in until labor makes it so. The jails will ever darken the land until the working class sweep them aside. The smooth, oily, politicians who receive your delegations are performing just as the warden. They are all the servants of capital. We are fools to expect anything from any one excepting ourselves. Listen! One can almost hear the cries of those incarcerated for principles. Strike! The eighth draws near."

Seventeen: A discussion of the coal strike settlement, which concludes:

*"If the voters of America elect to be slaves, let them say so at the polls.*

*"If the workers of the nation are worthy of being called free men they will, at the next election, kick into the discard the present governing class, and in its stead elect to positions of power men and women who have some slight concept of the true meaning of terms, and whose idea of language is not that it should be used to confuse and confound."*

Nineteen: An expression of thankfulness, in blank verse, from which is quoted:

"Behold the starving children
Of Russia
And Armenia
And Central Europe!
See where the groping peoples
Of India and Egypt
Are beaten down by guns!
See over the whole earth
*Anarchy* enthrones
In *industry*
And in *government,*
War upon war,

And black *hate*
Raving in *madness.*
In what spot of earth to-day
Is there cause
For thankfulness?"

The offense charged, if any, is to violate the provisions of the Espionage Act, as set out in the several counts (section 10212c, Compiled Statutes), which provides:

"Whoever, when the United States is at war, * * * shall willfully cause or attempt to cause, or incite or attempt to incite, insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct or attempt to obstruct the recruiting or enlistment service of the United States, and whoever, when the United States is at war, shall willfully utter, print, write, or publish any disloyal, profane, scurrilous, or abusive language about the form of government of the United States, or the Constitution of the United States, * * * or any language intended to bring the * * * government of the United States, or the Constitution of the United States, or the military or naval forces of the United States, * * * or the uniform of the army or navy of the United States into contempt, scorn, contumely, or disrepute, or shall willfully utter, print, write, or publish any language intended to incite, provoke, or encourage resistance to the United States, * * *" shall be punished.

Whether the acts set out tend to effect violation of the provisions of the section supra, as charged in the indictment, depends upon the character of the acts and the circumstances in which they are done. Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154; Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470. Was the language employed apparently sufficient, if disseminated and adopted, to produce the results condemned by the statute and charged in the indictment? Shaffer v. U. S., 255 Fed. 886, 167 C. C. A. 28; Balbas v. U. S., 257 Fed. 17, 168 C. C. A. 229. The court judicially knows that hostilities ceased in the Great War November 11, 1918, the day on which the armistice was signed; that soon thereafter demobilization began and continued; that the treaty of peace was signed at Versailles June 28, 1919; and that it has not been ratified by the Senate, and that no proclamation has been issued by the President declaring the war at an end. It is asserted by the defendants that the Espionage Act became inoperative when hostilities ceased, while it is claimed by the government that all of the provisions of the Espionage Act will continue until peace is proclaimed, and cites in support the decision of the Supreme Court in Hamilton, Collector, v. Ky. Distilleries & Warehouse Co., 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——. The Supreme Court in Hamilton v. Ky. Distilleries, supra, among other things said:

"It is shown that many war-time activities have been suspended, that large quantities of war materials have been disposed of, that trade with Germany has been resumed, and that the censorship of postal, telegraph, and wire communications has been removed."

It further says:

"That a statute valid when enacted may cease to have validity owing to the change of circumstances has been recognized with respect to state laws in several rate cases. Minn. Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L.

Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Missouri Rate Cases, 230 U. S. 474, 33 Sup. Ct. 975, 57 L. Ed. 1571; Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968. That the doctrine is applicable to Acts of Congress was conceded arguendo in Perrin v. U. S., 230 U. S. 478, 34 Sup. Ct. 387, 58 L. Ed. 691; and Johnson v. Gearlds, 234 U. S. 422, 34 Sup. Ct. 794, 58 L. Ed. 1383. In each of these cases Congress had prohibited the introduction of liquor into lands inhabited by Indians without specific limit of time. In one case the prohibition was in terms perpetual; in the other, it was to continue 'until otherwise provided by Congress.' In both cases it was contended that'the constitutional power of Congress over the subject-matter necessarily was limited to what was reasonably essential to the protection of the Indians."

The court, while assuming that since the power to impose a prohibition of this character was incident to the presence of the Indians, and their status as wards of the government, that it did not extend beyond what was reasonably essential to their protection, it followed that a prohibition valid in the beginning would become inoperative when, in the regular course, the Indians affected were completely emancipated from federal guardianship and control. The decision rested upon the question as to what was reasonably essential to the protection of the Indians, and, if any considerable number remained, the question was primarily for the lawmaking body, which was vested with wide discretion.

The Espionage Act is a war statute, and the duration of its operation cannot be determined by the duration of other war statutes, because the life of the war statutes with relation to prohibition, the emergency shipping fund, the charter rate requisition act, railroad control, food control, trading with the enemy, soldiers and sailors civil relief, wheat price act, are all determined by their own provisions, or a stated time or condition. From what is later stated, it is unnecessary to determine the legal status of the Espionage Act. The words and phrases used in the act supra, and in the indictment, are defined as follows:

Webster defines "disloyal" as "not true to." "Abusive," as "tending to deceive; practicing abuse; prone to ill treat by coarse, insulting words." "Scurrilous," "using the low and indecent language of the meaner sort of people; low indecency or abuse; mean; foul; vile." Synonym of vulgar; foul or foul-mouthed.

"Contempt" is defined by Webster as "the act of contemning or despising; the feeling with which one regards that which is esteemed mean, vile, or worthless; disdain; scorn."

"Scorn" is defined by Webster as "to hold in extreme contempt; to reject as unworthy of regard; to despise; to contemn; to disdain."

"Contumely" is defined by Webster as "rudeness compounded of haughtiness and contempt; scornful insolence; despiteful treatment; disdain; contemptuousness in act or speech; disgrace."

"Disrepute" is defined by Webster as "loss or want of reputation; ill character; disesteem; discredit."

"Incite, provoke, and encourage resistance" is defined as follows: "Incite" means to move to action, to stire up, to spur or urge on. Webster's Dictionary. "Request," "advise," and "incite" are held in Long v. State, 23 Neb. 33, 36 N. W. 310, equivalent to the statutory

words "aid," "abet," and "provoke." "Provoke" is defined by Webster "to call forth, to call into being or action." In State v. Warner, 34 Conn. 276, the court said: "To provoke is to excite, to stimulate, to arouse," as where violent language arouses the bad passions of another, and he replies in kind; strife, contention. "Provoke" is said in Cook v. State, 43 Tex. Cr. R. 182, 63 S. W. 872, 96 Am. St. Rep. 854, and Casner v. State, 43 Tex. Cr. R. 12, 62 S. W. 914, as meaning, in the ordinary sense, to excite to anger or passion, to exasperate, irritate, or enrage. "Encourage" is defined by Webster as giving courage to; inspiring with courage, spirit, or hope. "Resistance" is defined as the act of standing against or obstructing. "Encourage resistance" may be defined as the act of inspiring with courage to stand against or obstruct.

An analysis of each of the charges, and the plan set out, and the overt acts, is conclusive that no attack is made upon the form of the government or the Constitution of the United States. There is a distinction between the government of the United States and its administering agents. The form of government is enduring. The administering agents are selected periodically. An attack upon the form of government and the Constitution is not accomplished by criticism of the policy of the administering agents or official conduct of the selected servants. Justice Holmes, in Frohwerk v. U. S., supra, said: "We do not lose our right to condemn measures or men because the country is at war." There is a wide distinction between the publications in the case at bar and in the case of U. S. v. Wells et al., 262 Fed. 833 (opinion filed in this court July 31, 1917), where the charge was conspiracy to oppose by force the execution of the laws of the United States, and also to violate section 211, P. C. The literature in that case was of a very different type. The literature in the Frohwerk Case, supra, as shown by the opinion of the court, was also of a very different character, and the United States was then mobilizing its army. Whereas in the case at bar it was demobilizing its army. We have nothing to do with the laws of the state of Washington. We have only to do with the laws of the United States in so far as the acts charged are comprehended within its provisions. The burden of each publication in issue is with relation to strikes, securing bail for prisoners, collecting money for the establishment of a newspaper, report of the Minor meeting, report of the Smillie meeting and of a Chicago convention, and expressing opinion with relation to conditions in industrial conditions, and suggestion with relation to changes of methods to co-operative plans, and venturing opinion that revolution is inevitable if conditions continue; but nowhere is there apparent any statement advocating any change other than by constitutional methods; nor is any language employed, apparently efficient, if disseminated and employed in view of the war status, to produce the results charged against the act supra, and charged in the indictment, and all print, etc., indicates a different intent and purpose; nor is anything printed, etc., which would tend to support Germany and Austria-Hungary; and what is said with relation to the various overt acts is applicable to count 7, charging violation of section 211, P. C. There is no fact pleaded which comprehends

the broad scope of the recitals of count 4, nor any act to effect any of the charges. A cartload of newspaper articles would not change the overt acts charged, since each act discloses a complete plan, and the plan and acts carrying out the plan are not criminal. It would be an unnecessary consumption of time, and unnecessary expense, to have all of the evidence presented in court, and then dismiss the case upon matters apparent in the record now. A review of this decision can be speedily obtained, if desired.

Justice, in my opinion, requires that the demurrer be sustained; and it is so ordered.