# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

**SCHOBORG v. UNITED STATES. FELTMAN v. SAME. KRUSE v. SAME.***

(Circuit Court of Appeals, Sixth Circuit. March 12, 1920.)

Nos. 3273–3275.

**1. War ⬳4—Language held to support conviction for favoring enemy and opposing United States.**

Language used by defendants in discussing the war, the disasters of the Allies, and the successes of the enemy from day to day and week to week in a shop used as a place of meeting, gossip, and discussion, *held* to support a conviction for favoring the cause of the enemy and opposing the cause of the United States, in violation of Espionage Act, tit. 1, § 3, as amended by Act May 16, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), and not within the protection of the first amendment.

**2. Constitutional law ⬳48—Statute given narrow construction to avoid unconstitutionality.**

Language in a statute, which is capable of a very broad or of a narrower construction, should receive the latter, where the former would or might make it unconstitutional, and where the latter is sufficient to reach the case before the court.

**3. War ⬳4—Incitement in fact need not be incitement in form.**

There may be incitement, in fact punishable under the Espionage Act, which is not so in form.

**4. War ⬳4—Presumptive intent supports conviction.**

A presumptive intent is not insufficient to support a conviction under the Espionage Act, merely because it is presumptive.

**5. Criminal law ⬳371(1)—Similar statements admissible under Espionage Act to show intent.**

In a prosecution under the Espionage Act for supporting or favoring the cause of the enemy and opposing that of the United States, proof of statements similar to those alleged in the indictment, made at nearby times and places, were properly admitted, to show the intent with which defendants spoke the words charged.

**6. Criminal law ⬳371(1)—Similar statements admissible under Espionage Act to show state of mind.**

In a prosecution under the Espionage Act for supporting or favoring the cause of the enemy and opposing that of the United States, proof of statements similar to those alleged in the indictment which might have

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 252 U. S. —, 40 Sup. Ct. 586, 64 L. Ed. —.

264 F.—1

been themselves the subjects of prosecution was admissible, as tending to corroborate the testimony concerning the statements charged by showing defendants' state of mind.

**7. Criminal law ⊜⇒374—Similar statements not limited to those subsequent to passage of act creating offense.**

In a prosecution under the Espionage Act for supporting or favoring the cause of the enemy and opposing that of the United States, statements similar to those charged in the indictment were not inadmissible to prove intent or defendants' attitude or state of mind because made before May 16, 1918, the date the amendment to the Espionage Act became effective.

**8. Criminal law ⊜⇒444, 446—Notes and reports of conversation admissible, where witnesses testified they were correct.**

On a trial under the Espionage Act, where witnesses, who listened to conversations in which defendants participated by means of a dictograph, testified that they had no independent recollection in detail of the statements made, but that notes made at the time and reports made each day were correct, the notes and reports were admissible; the credit to be given them being for the jury.

**9. Criminal law ⊜⇒435—Conversations not inadmissible because notes thereof limited to statements showing offense.**

Where witnesses for the government in prosecutions under the Espionage Act had, by means of a dictograph, listened for several weeks to conversations in which defendants took part, their notes and reports of such conversations, which they testified were correct, were not inadmissible because they took notes only of statements having reference to the war or defendants' attitude towards it.

**10. Criminal law ⊜⇒1175—Insufficiency of evidence to support conviction under one of several counts immaterial.**

In a prosecution under the Espionage Act, the claimed insufficiency of the evidence to support a conviction under one of various counts under which defendant was convicted *held* immaterial.

**11. Criminal law ⊜⇒825(2)—Defendants cannot complain of failure of charge to contain limitation not requested.**

On appeal in a prosecution under the Espionage Act, defendants could not complain of an instruction that it was sufficient to make out the offense if the words were intended to and reasonably calculated to some extent to help the cause of the enemy and injure that of the United States, without adding that the jury must find a condition of things which would make the words spoken tend to create a clear and present danger, where they merely excepted to the charge as given, and did not ask such modification or limitation.

**12. Criminal law ⊜⇒847—Instruction not erroneous, where theory making it inapplicable not pointed out.**

On a trial under the Espionage Act, an instruction that it was possible for one to be guilty of the offense of favoring the cause of the enemy, or opposing that of the United States, by a declaration that he was on the side of Germany, or wanted to see Germany win, or that he was against the United States and wanted to see the United States lose, though possibly too narrow, was not erroneous or prejudicial, where defendants did not point out the particular theory making it inapplicable to the case.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

C. B. Schoborg, Henry Feltman, and J. Henry Kruse were convicted of offenses, and they bring error. Affirmed.

In and about Covington, Ky., there is a considerable community of German birth or descent. In 1917 and 1918 it was not uncommonly believed that a

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

portion of this community was disloyal, and upheld and favored the cause of Germany as against the United States, in the pending war, and steps were taken to ascertain whether this belief was well founded. In the Latonia district of Covington, Charles B. Schoborg maintained a shoe cobbler's shop. He was 66 years old, was born in Germany, and came to this country in childhood. From 1872 till 1914, save for 4 years' absence from the state, he had been continuously connected with the Covington city government as policeman and marshal, member of the board of trustees or city council, or police judge or magistrate. He was a man of intelligence, was commonly called "judge," and was evidently fitted to be, and was, a leader of opinion among his associates. His shop was used by them as a place of meeting, gossip, and discussion. Among them were Henry Feltman and Henry Kruse. Feltman was a tobacco dealer and banker in Cincinnati and Covington, and lived near Covington. He was 65, born in this country; his father came from Germany in childhood. Schoborg's shop was near where Feltman took and left the street car morning and night between his home and Cincinnati, and he was accustomed to step in there occasionally at other times. Kruse was 56 years old, and was born in this country of German parents. He had long been treasurer of a Covington brewery. He was a lifelong friend of Schoborg, and visited the shop often mornings and on Saturday afternoons, and very commonly in the evening, using it, he says, "as a loafing place" to sit down and talk and "meet the same old crowd."

Desiring to know what was going on in this shop, a volunteer association of citizens employed a detective agency, which found means to have a dictograph installed in the room, in March, 1918, with wires communicating with a listening station in a near-by building. Employés of the agency, called "operators," took turns in listening, and, in this way, knowledge was obtained of what was said in the shop from the time it opened in the morning until it closed at night, for a total of 5 or 6 weeks of the period from March until July. As they listened, the operators made notes of the substance of what they heard. As the result of presenting their testimony to the grand jury, separate indictments were found against Schoborg, Feltman, and Kruse, alleging, in many counts and in various forms, violation of section 3, of title 1 of the Espionage Act of June 15, 1917, as amended May 16, 1918 (40 Stat. 553 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c]). These indictments (now) all rest upon the last clause of the amended statute,[1] denouncing word or act which supports or favors the cause of the enemy or opposes the cause of the United States. In successive and separate trials, extending over about 2 weeks in all, each of the three was convicted. Each brings a separate writ of error. The most important questions are so far common to the three cases that the three may well be disposed of in one opinion.

It is not feasible to repeat all the things which the operators claim to have heard said during this period by the different defendants. There was a great amount of repetition, the same sentiments having been expressed over and over again by the same speakers. A selection of enough of the alleged statements to show the general character of the discussion, is given in the margin.[2] It is enough to say here that the shop was the more or less regu-

---

[1] Some counts were withdrawn from the jury, and require no mention.

[2] The case against Feltman, as establishing his attitude and state of mind, consisted, to a considerable extent, in his seeming acquiescence in, and approval of, some of the most violent statements made by Schoborg and Kruse, and in his joining in laughter and jeers at the claims of the Allies and the United States as to the progress of the war. Some of his more direct statements were, in substance: The Germans are going through like a streak, and things look rosy all around. It is a damned shame we cannot get the truth by way of England, and, if you want truth, you have to get it from Germany, for you can depend on Germany telling the truth. Am disgusted with damned English, and hope Germans kill them all. Lot of lies in papers this morning about English retaking ground. When right-thinking people wake up, there will be a social revolution in this country, and I would like to see it. The general that licked the Russians will lick the English,

lar, meeting place of this informal club during the period from March until July, 1918, when the Germans, upon the west front, were constantly successful and the Allies constantly defeated, and that each one of the three, by what he said and by his express or implied approval of what others said, in discussing from day to day and from week to week the news of this series of disasters for the Allies, participated in rejoicing at the victory of the one and the defeat of the other, and, in great variety of form and expression, indicated his support and upholding of the German cause and his disparagement of, and opposition to, that of the United States. Disloyalty, extreme, pervasive, and constant, but shown by words only, could hardly be conceived in more typical and complete form.

S. T. McPherson, of Cincinnati, Ohio, and O. M. Rogers, of Covington, Ky., for plaintiffs in error.

Thos. D. Slattery, U. S. Atty., of Covington, Ky.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] Common to the three cases is the claim that in so far as the Espionage

French, and Americans. The Allies are afraid to ask for peace, now: if they did, the people would know they are licked, like the Kaiser says. They ought to ask for peace, now, for France and even the United States will be destroyed, just like Servia, Roumania and Russia, and the rest, I think. By May, the whole thing will be over. The English and French cannot stand the bombardment. If Germany breaks through the English lines, that will settle the war. Germany is as solid as a rock. German universities are the best in the world, and Germany is now reaping the harvest of those schools. These days show the truth of the claim that England never fought her own battles, but always let some one else do it for her. There will be no peace, now, for Germany won't concede as much now as she would have done, even before we went into the war. She would be a damned fool, if she did, for "to the victor belongs the spoils." The Kaiser will have all those other countries with him, and, as long as he has Russia, they know that it makes him stronger, and they will go to him. If any one comes to my house soliciting for the Red Cross, my wife says she will put them out. They get away with more money than it takes to run the German army. One hundred million dollars is an awful lot of money to buy bandages. They get none of my money. England does not want any democracy. She bluffed the world for a long time. The Germans are ready for a big drive. Germany takes the aggressive; the Allies sit down till the Germans open up and the Allies have the worst of it. They stuck a Red Cross sign on my car, at the garage, and I wanted to know who put that damned thing on; I didn't want it on. The poor people are complaining about the insistence that they subscribe for Liberty Bonds, thrift stamps, and the Red Cross. Do not worry about the whole world trying to beat Germany. She will whip the whole bunch. Germany will have Russia, the Mediterranean Sea, the Dardanelles, and she will have Asia. The war is liable to last seven years, and Germany will be the victor. The United States, England, and France will be left on the money loaned Russia. That is a good thing. Germany is not ready for that drive yet; but, when she is, she will make a good one.

The statements of Schoborg and Kruse were far more extreme; ridiculed the possibility of the United States taking effective part in the war; said that, as the Germans had the name of blowing up munition plants, they might as well have the game; expressed the expectation and hope that the submarines would get every troop ship that went across; said all that Germany wants is her rights; that when Hindenburg asked for troops, they responded and did not have to be conscripted as in this country; that they ought to give Roosevelt a loaded shell where it would do the most good, because he was a damned agitator, and the quicker they got rid of him, the better, etc., etc.

Act undertakes to punish what was said by these respondents, it is in violation of the First Amendment to the Constitution, in that it abridges the right of free speech. The meaning and extent of this constitutional restriction have been often discussed in familiar cases. We need do no more than to refer to the latest discussion, found in the Schenck Case, 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; but that discussion falls short of expressly reaching the present case, because it had to do with the act before amendment and with words which directly produced conditions which Congress had a clear right to forbid—obstructing recruiting and enlistment, causing disloyalty among the military forces, etc.—while the last clause of the amended statute reaches all instances, without expressed regard to their tendency or result, where words are employed to favor the cause of the one or oppose the cause of the other.

Counsel insistently urge the proposition that a citizen, acting with reasonable attention to the information available, and upon what he in good faith believes the facts to be, has a right to think that this country is wrong in one or more of the positions which have led to war, and that the enemy country is therein right, or to believe that the declaration of war by this country was, upon a balance of considerations, wrong, or that the further prosecution of the war is inadvisable, and that, holding any of these beliefs, he has a right to speak or write them in an endeavor to convert his fellow citizens thereto. However accurate or erroneous this proposition may be, we conclude that the situation shown by these records is of a different character, and that these respondents cannot effectively claim this right.

[2] It is familiar law that language in a statute which is capable of a very broad or of a narrower construction should receive the latter where the former would or might make it unconstitutional, and where the latter is sufficient to reach the case before the court (U. S. v. Delaware Co., 213 U. S. 366, 407, 408, 29 Sup. Ct. 527, 53 L. Ed. 836), and hence it is not very important to point out that "favor," "support," and "oppose," as mere words, may have definition broad enough to cover and include some things which are also within the protection of the First Amendment; the really important question is whether that particular kind and degree of favor, support, or opposition alleged against defendants here is within the constitutional immunity.

[3, 4] Nor are we helped by any hard and fast formula distinguishing between the direct and the indirect causation of tangible injury. These are relative terms at any time, and in war time they take on a different color from that which they would carry in peace, when used to express the measure of constitutional right; and they could not be judged from the same aspect in 1918 as in 1898. In another branch of the law, the negligence may be deemed the proximate cause of the injury, even though there is more than one link in the chain of causation. Nor can we draw a fixed line between agitation and incitement; there may be incitement in fact which is not so in form.[3] Nor can a

[3] "The Beatitudes have for some centuries been considered highly hortatory, though they do not contain the injunction, 'Go thou and do likewise.'" Hough, J., in Masses v. Patten, 245 Fed. 102, 106, 157 C. C. A. 398, 402.

presumptive intent be insufficient merely because it is presumptive; an inference of intent may be strong enough to overbalance an express declaration; actions speak louder than words.[4] Even if—as we are urged to do—we view with "post-armistice mind" the defendants' conduct, we cannot forget that it occurred under pre-armistice conditions.

Not because it was declared with reference to the particular clause of the law now involved, nor because it is so unambiguous as to furnish an infallible criterion, but because we know of no better formulation, we adopt, for our guidance, Mr. Justice Holmes' conclusion in the Schenck Case, 249 U. S: 47, 52, 39 Sup. Ct. 247, 249 (63 L. Ed. 470):

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war, many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight, and that no court could regard them as protected by any constitutional right."

We cannot doubt that the words in these indictments alleged, as shown by the proofs, as they have been above quoted and summarized, come within this condemnation; and, if there were doubt, the jury has found the forbidden intent, character and effect, and under instructions not substantially different from those which were given by Judge Westenhaver in the Debs Case (Department Justice Bulletin, No: 155), and in effect approved by the Supreme Court (249 U. S. 211, 215, 39 Sup. Ct. 252, 63 L. Ed. 566). See, also, Abrams v. U. S., 250 U. S. 616, 619, 40 Sup. Ct. 17, 63 L. Ed. 1173.[5]

It is strenuously insisted that defendants' conduct could not be thought to have any direct tendency to cause the obnoxious "substantive evils," because what they said was spoken secretly and among themselves. However true this might be of the ordinary, casual conversation, it cannot reach the long-continued maintenance of an intensive school of disloyalty. Even if the talk had been confined to the three respondents, the cumulative effect upon each of what the others said would be to aggravate, if not cause, an extremity and recklessness in opposition to the war and favor to the enemy which would be an incitement to direct obstruction and injury in the many ways open to the evil disposed in that vicinity.[6] But the talk was not confined to these three. Several others were present more or less, and that the

---

[4] In the Wimmer Case, 264 Fed. 11, —— C. C. A. ——, argued with these, defendants' counsel called attention to an article in the Harvard Law Review, vol. 32, p. 932, "Freedom of Speech in War Time." This is an exhaustive presentation of the theories upon which defendants' counsel in these cases rely with reference to the effect of the First Amendment.

[5] Since this opinion was prepared, the Supreme Court on March 1, decided Schaefer v. U. S., 251 U. S. 466, 40 Sup. Ct. 259, 64 L. Ed. ——. The opinion of the court points out that the lawful and constitutional power has limits amply broad enough to include the punishment of the conduct of Schoborg, Feltman and Kruse.

[6] As an illustration (outside the record), it was a matter of notoriety that at about this time, in this vicinity, a large number of horses belonging to the government and in transit for military purposes, died and it was said

influence of such a center would radiate through an appreciable part of the community is too sure for doubt.

2. All respondents also join in the claim that the tenth clause of the Espionage Act is invalid, because it unwarrantably extends the constitutional definition of the crime of treason. This subject is discussed and disposed of by the accompanying opinion in the Wimmer Case.

[5] 3. In all the trials, each of the alleged statements was directly proved by only one witness. Proof of other similar statements (not alleged in the indictments), made at nearby times and places, was received and allowed to go to the jury as evidence of the intent with which the defendants spoke the words charged. Objection was made, because this amounted to proving other similar offenses, in violation of the familiar rule. We had occasion to consider this subject carefully, in Shea v. U. S., 236 Fed. 97, 102, 149 C. C. A. 307; it being there necessary to make an application of the exception, as familiar as the rule, which permits evidence of other crimes or offenses when the intent with which defendant acted in the matter charged is important, and when these other things throw light on that intent. We think these espionage prosecutions furnish clear instances of the proper application of the exception. The intent with which the words charged are spoken is a vital element of the offense. Whatever tends to show the defendant's state of mind on this subject-matter at the time of the speaking of the words charged is very clearly admissible for that purpose. This is the uniform holding in the recent considerations of this question. Schulze v. U. S. (C. C. A. 9), 259 Fed. 189, 191, —— C. C. A. ——; Balbas v. U. S. (C. C. A. 7) 257 Fed. 17, 24, 168 C. C. A. 229. See, also, our rulings on this subject in White v. U. S. 263 Fed. 17, —— C. C. A. ——, filed February 19, 1920, and the Wimmer Case, decided herewith.

[6] 4. In two cases (Feltman and Kruse) the court went further and permitted the proof of other similar statements, not alleged in the indictments, to be considered by the jury as proof tending to corroborate the testimony of the single witness who testified to the statements in the indictment, and as proof tending to show that defendants did make the statements upon which the prosecution was directly based. These additional and outside statements were, or might have been, themselves the subjects of prosecution, and thus there superficially appears to have been a violation of the general rule, and one which was not confined to the recognized limits of the exception. The question is whether there was a substantial violation, and whether the reason of the exception extends also to this particular situation.

The offense herein involved is of a peculiar character. The word or act upon which the prosecution directly depends is nothing but the outward manifestation of the defendants' state of mind. This disloyal mind is not impulsive and evanescent. It is likely to be permanent and fixed. Its existence is of the essence of the offense and of the inquiry. Anything which shows that existence and its disclosure on one day

were poisoned; also, that a great amount of government work, upon munitions and machinery, was in progress in the nearby towns of Cincinnati, Covington and Newport.

makes distinctly more probable the disputed happening of a similar disclosure on the next day. The case does not align itself with those where defendant is charged with a burglary, and it may not be shown that he had committed other burglaries, merely as indicating that he was of a burglarious turn of mind; in those cases there is no such intimate connection between the criminal act and the contemporaneous intent, as where the thing charged is the merely incidental and natural manifestation of the constant state of mind, overflowing into words. The case is rather like a prosecution for murder, where the respondent's participation is wholly denied, but where, nevertheless, the probability of his participation may be shown by proving the existence of motive, even if the proof of motive and disposition is by way of showing a previous attempt to kill the same man; or like a conspiracy prosecution, where the underlying conspiracy may be shown by other overt acts than those alleged in the indictment, even though they also would have matured the conspiracy into an indictable offense; or like a prosecution for using the mails in a scheme to defraud, where it would seem (although we do not know that it has been held) that proof that the defendant mailed a hundred similar letters at the same time and place would legitimately tend to corroborate other more direct proof that he mailed the particular letter named in the indictment. See full discussion of the general subject in Chamberlayne's Evidence, c. 48, Relevancy of Similarity; Moral Uniformity, and particularly proof of Mental State, §§ 3221, 3242, 3243, 3245, 3254, 3256, 3263. Stated metaphysically, the proposition covering this and the preceding paragraph is that intent is in many cases, as here, a constituent fact, and may be proved by any relevant fact, as by other manifestations of the same intent, while motive, disposition, inclination, like opportunity, are probative facts and may be likewise proved, if administrative requirements justify. In either case, the fact that the relevant proof tends to show another offense does not compel its rejection.

[7] Without intending to encroach in the least upon the salutary rule that in general confines the trial to an inquiry as to the commission of the particular offense alleged, we conclude that the rulings of the court below and the carefully guarded language in which they were expressed [7] did not interfere with the rightful extent of the ap-

[7] From the charge in the Feltman case: "I want to indicate to you the pertinence and the bearing of those statements that have been introduced here in evidence and that are not charged in the counts of the indictment that is submitted to you. In the first place, the defendant is not on trial for those statements. In the second place, they are not evidence directly of the fact that he did speak and utter the words charged in the 14 counts of the indictment. The bearing of those statements, if you believe from the evidence that they were made, is on his attitude, as to whether or not he was disloyal, whether or not his mind and heart are on the side of Germany and against the side of the United States. That is the bearing and pertinency of those statements. Taking them as true, do they or not show, as between Germany and the United States, he is on the side of Germany and against the United States? If you reach the conclusion that they do that, then you can make use of that attitude for two purposes, in determining the intent with which he uttered the words charged in the indictment, the pur-

plication of the rule to the peculiar situation here existing. Neither with regard to the proof of intent nor of attitude or state of mind is it determinative that some of the other statements were made before May 16, 1918, the effective date of the law, if only they were made not long before the statements named in the indictment.

[8] 5. The court received in evidence both the notes that the operators made simultaneously with their listening and the reports which they wrote out at the close of each day. They testified generally that at the time of the trial they had no independent recollection in detail of the statements made, but they knew that their notes were correct, and knew that the fuller report at the end of each day was accurate. Under these circumstances it was not error to receive these notes and reports. The credit to be given them was for the jury. See cases collected in 10 R. C. L. p. 1145; also Insurance Co. v. Weide, 14 Wall. 375, 380, 20 L. Ed. 894. Bates v. Preble, 151 U. S. 149, 157, 14 Sup. Ct. 277, 38 L. Ed. 106, is not to the contrary. Wigmore on Evidence, vol. 1, § 754.

[9] 6. The operators testified that their instructions had been to take down notes of all the conversation of defendants which bore on their supposed pro-German attitude, and said that they followed these instructions, and did not take down or try to remember all the conversation and statements which had no reference to the subject of the war or defendants' attitude toward it. Their testimony and the reports were objected to because of this incomplete character, and it was insisted that the testimony should cover the whole conversation or statement, and that the reports should do the same. The court held that the great part of what was said while the operators listened during these six weeks was obviously immaterial and need not be repeated, nor was there any obligation to embody it in the reports, and that the instructions to the operators to get only the defendants' talk with reference to their attitude, and the operators' testimony that they only tried to get that part of what was said, were for the jury to consider as bearing on the good faith of these witnesses and the credit that should be given to the notes and reports. In this there was no error. Testimony as to a conversation is always limited to the subject-matter involved, unless the cross-examiner wishes to go further.

pose he had in doing it—you have a right to consider that attitude in determining that intent. And still further, in determining whether or not the defendant uttered and spoke the words charged in the indictment, you have a right to consider that attitude, and that attitude, if such was his attitude to be inferred from those words, tends to support the government's contention that the words were uttered. It is natural for a man to talk as he thinks, to give expression to the sympathy which he carries. So you have a right to consider these other statements not charged in the fourteen counts of the indictment and the statements charged in the indictment not submitted to you, if you believe from the evidence that they were uttered in determining his attitude as between Germany and the United States; and if you reach the conclusion that they show that he was on the side of Germany and against the United States, you have a right to use that attitude as bearing on the question as to intent and purpose for which he uttered the words and as bearing on the question as to whether or not he actually uttered the words at all."

[10] 7. In the Schoborg Case, complaint is made that there was no evidence to support the twenty-seventh count of the indictment which was submitted to the jury and covered by the verdict of guilty. If this were true, it would not be important if the conviction upon the other counts is to be sustained. It seems probable that there is a mistake in this particular, because the principles upon which the court acted would indicate that he intended to withdraw count 27 from the jury, and instead to submit one of those which were withdrawn; but this is not material to the question of reversal.

[11] 8. It is objected that the court charged that it was sufficient to make out the statutory offense if the words were intended to and were reasonably calculated to some extent to help the cause of the one and injure the cause of the other, without going further and saying that the jury must find in the circumstances of the particular utterance a condition of things which would make the words spoken tend to create a clear and present danger. If the charge as given should have been modified and limited as now claimed, it was the duty of defendants to bring to the attention of the court the limitations which they desired incorporated. They did nothing except to save an exception to this paragraph of the charge as given. When a charge is correct in its general thought and aspect, and is later criticized only because it did not draw sufficiently refined distinctions, a mere general exception to the proposition as given by the court is not sufficient basis for review—lacking reasonably clear inference that the precise limitation was intended to be relied upon and to be put before the court.

[12] 9. The same is true as to the complaints against the charge because it told the jury that it was possible for one to be guilty of the offense by a declaration that he is on the side of Germany or wants to see Germany win, or that he is against the United States and wants to see the United States lose. It is said that this is entirely too narrow a construction. So it may be, sometimes; yet undoubtedly there might be cases where it would be a perfectly accurate statement. The defendants should have pointed out to the trial judge their particular theory which made it inapplicable to this case. We cannot say that it was either erroneous or prejudicial.

10. Feltman had been a subscriber to The Fatherland and the New York Staats-Zeitung. There was evidence which was said to indicate that he had also been a reader of The Bull, and, if this were true, it would, in connection with his subscription to the other papers, tend to corroborate the charge that he opposed the cause of the United States and supported that of Germany. The evidence regarding The Bull was not strong, but we cannot say it had no tendency in the direction claimed, or that there was error in letting it go to the jury. It is not important to discuss the details of the question.

11. The errors alleged are very numerous, but they are either all substantially covered by what we have said in the grouping of the various subjects, or they impress us as not calling for separate discussion.

The judgment below, in each of the three cases, is affirmed.