[No. 30503. Department Two. July 22, 1948.]

THE STATE OF WASHINGTON, *Respondent,* v. ORIEN GROSS,
*Appellant.*[1]

[1]Reported in 196 P. (2d) 297.

*Allen, Hilen, Froude & DeGarmo* and *Robertson & Smith,* for appellant.

*Leslie M. Carroll* and *Clarence P. Smith,* for respondent.

STEINERT, J.—By information filed by the prosecuting attorney for Spokane county, the defendant was charged, in each of sixteen counts, with the crime of being a common gambler. The charging part of the first count reads as follows:

"That the said defendant, Orien Gross, in the County of Spokane, State of Washington, on or about the 20th day of February, 1945, then and there being, did then and there

willfully, unlawfully and feloniously open up, carry on, operate and conduct, as owner, manager, agent, clerk and/or employee, in that certain building known as the B P O K [Benevolent and Protective Order of Keglers] Lodge No. 1 or Keglers Club, located at East 526 Sprague Avenue in the City of Spokane, said county and state, a gambling game and game of chance commonly known as 4-5-6 played with dice, whereby money and its representative thereof was then and there bet, wagered and hazarded upon a chance and an uncertain and contingent event."

The fifteen additional counts were identical in form with that of the first count, except that each count specified a different date on which the alleged offense was committed. These dates, as thus specified, fell within the period beginning February 20, 1945, and ending November 22, 1946.

The charges against defendant were brought under Rem. Rev. Stat., § 2469 [P.P.C. § 116-123], which is one of the sections of the statute relating to gambling and reads as follows:

"*Conducting gambling.* Every person who shall open, conduct, carry on or operate, whether as owner, manager, agent, dealer, clerk, or employee, and whether for hire or not, any gambling game or game of chance, played with cards, dice, or any other device, or any scheme or device whereby any money or property or any representative of either, may be bet, wagered or hazarded upon any chance, or any uncertain or contingent event, shall be a common gambler, and shall be punished by imprisonment in the state penitentiary for not more than five years."

Defendant pleaded not guilty as to each of the counts, and thereafter the cause was tried to a jury, which returned a verdict of guilty on each of the sixteen counts. Defendant's motions in arrest of judgment and for new trial having been denied, the trial court entered judgment of conviction, sentencing defendant upon each count to imprisonment in the state penitentiary for a term of not more than five years, the sentences to run concurrently. Defendant appealed.

In his argument on the appeal, appellant does not contend that the evidence was insufficient to sustain the verdict, but only that, because of errors committed by the trial court,

he is entitled to a new trial. Therefore, in stating the case made by the prosecution, we shall set forth the details to the extent deemed necessary to a proper understanding of the questions presented on the appeal.

In 1939, appellant and five associates, to whom appellant referred as the "founding fathers," organized and incorporated what is known as the Grand Lodge of Benevolent and Protective Order of Keglers, a fraternal organization having for its object the promotion of the bowling sport and the interests of bowlers. Shortly thereafter, the grand lodge issued a charter to lodge number one, consisting of one hundred members and known as Keglers Lodge No. 1, or Keglers club, located at 526 Sprague avenue in the city of Spokane.

Appellant and five of the associate members were the original directors of this subsidiary organization. Since the grand lodge and the subordinate lodge are for all purposes, so far as this action is concerned, one and the same, we shall refer to both of them, as they are referred to in the evidence, simply as the "Keglers," or the "Keglers club."

In September, 1940, the Keglers club made application to the state liquor control board for a club license, under the Washington state liquor act. The application recited, among other things, that the club offered to its membership certain facilities, including a lounge room, reading room, lodge room, dining room, card room, tap room, cocktail lounge, bowling alleys, and conditioning department. In the lounge room were a dance floor and an orchestra pavilion. All of these facilities were in rooms located on the main floor of the club. Back, and at one end, of the bar was a narrow stairway leading to the floor above, where there were two small rooms and service quarters. It was in these upstairs rooms that the gambling herein referred to took place.

The application of the club for a license was granted, and a club license, commonly known as a 23 T license, was issued to it, and this has been renewed annually ever since.

Appellant was made manager of the club in 1941 and continued to hold that position until shortly before the filing of the information herein. During 1945 and 1946, appellant

was also a trustee of the organization, its secretary, and its treasurer. He and his wife and his brother were the trustees in charge of the members' liquor pool funds. As manager, appellant had complete control and supervision of the club, its premises, employees, and activities. Upon his recommendation, the various employees were hired and discharged. In fact, during 1945 and 1946, the Keglers club was practically a one-man organization, so far as control over its operations was concerned.

For several years prior to 1947, it had been the custom to hold "stag night" parties at the club, following the regular lodge meetings on the third Monday evening of each month. At the direction of the board of trustees of the lodge, appellant made and carried out all the arrangements for food, entertainment, and refreshments, to be supplied either before or after the regular lodge meetings.

The state's evidence showed that not only on those occasions, but frequently on others, a game known as "4-5-6" was played in the upstairs rooms, often lasting past midnight and sometimes as late as the afternoon of the next day. One of the state's witnesses described and explained the game as follows:

"Well, the game is played on a circular table with a dice cup and three dice. Certain combinations of those three dice are winners, and an equal number of combinations are losers. One person has the dice originally, and he is known as the banker in the game. He has the option of wagering any amount of money that he wishes. The banker has a certain sum of money that he sets forth on the table to wager against the other players in the game for the privilege of accepting all or portions of the bank and covering the bets. Then the banker will roll the three dice, and if he rolls a winning combination he wins, and if he rolls a losing combination he loses that money. If he rolls combinations neither winner nor loser, his opponents who have covered his bank have an opportunity to roll the dice, and if they roll a higher or lower number than the banker rolled, they win or lose accordingly."

The dice which were used at the Keglers club were kept upstairs in a locked closet, the key to which was retained by one of the club's regular employees.

Usually a specially hired employee, called a "stick man," or "dealer," assisted in the conduct or operation of the game. Sometimes another specially hired employee acted as a "layout man." The players in the game had no voice in the matter of selecting the stick man or the layout man.

The stick man, working in connection with the player who happened to be the banker at the time of a particular game, distributed the money as the bets were made, called the combinations as the dice were rolled, and, with an L-shaped stick, raked in the dice after the combinations had been ascertained. He also acted as a kind of umpire to settle any disputes arising among the players during the game. Sometimes one of the regular employees of the Keglers club acted as stick man in these games and discharged the duties as set forth above.

The layout man was, as also described by one of the witnesses, a "man who works for the house," that is, he took bets for the house during the course of the game. He was supplied with house money before the game started, and operated on the opposite side of the table from the stick man. His time and attention were devoted to taking such side bets as the players wished to make against the house, independently of the banker or the money in the bank. The money which the layout man won belonged to the house, and no part of it was returned to the players after the game.

Out of each "pot," or "bank," a certain amount was taken, usually fifty cents or a dollar, which went to the house. These "cuts," of which there was an average of about fifteen in an hour's play, were placed in a box which the dealer or stick man kept on the table in front of him. After the game was over, the stick man paid for any services that had been rendered by any of the club employees during the game, and also paid the janitors who cleaned up the rooms afterwards. Whatever balance was left the stick man retained for himself or else left in the box on the table, for the house. No part of that money was ever divided among the players.

It is clear from the evidence that large sums of money were wagered in these games of "4-5-6" played at the Keglers club. It was not uncommon to see several, or even

many, hundreds of dollars change hands on one roll of the dice. At times, bets were built up to an amount as high as four thousand dollars and were won or lost accordingly. The principal witness for the state, D. J. MacGillivray, Jr., testified that he lost in excess of forty-four thousand dollars in these games, as evidenced by checks issued by him totaling that amount.

The state further introduced evidence, through various participants in the games, to the effect that appellant was present on many, if not all, of the occasions when these games were played; that he notified various individuals, by telephone or otherwise, when the games were to take place; and that he engaged the stick men and layout men, and on certain occasions paid them out of his own pocket for their services.

It is but proper to say, in this connection, that appellant strenuously denied that he had ever had anything to do with the setup, conduct, or operation of any of the games as played, except as a participating player, the same as all the other players. He denied that he had ever in any way supplied any of the paraphernalia connected with the game, or had ever employed or paid any stick man or layout man, or had ever notified anyone concerning the time or place of any of the games, or that he or the club had ever realized one penny from the proceeds of the amounts wagered in the games. His testimony was supported to some extent by the testimony of other witnesses. However, appellant's evidence served only to raise issues of fact on those matters, and appellant concedes that the state's evidence, if believed by the jury, was sufficient to sustain the verdict.

We shall now consider appellant's assignments of error, which he has grouped and argues under four heads: (1) that the trial court misconstrued Rem. Rev. Stat., §.2469, quoted above, under which the information was drawn; (2) that certain checks were improperly admitted in evidence against him; (3) that the court erred·in refusing to give a requested instruction on the subject of accomplices; and (4) that certain actions and rulings by the trial court constituted misconduct.

Under the first group of assignments, appellant contends that the court confused Rem. Rev. Stat., § 2469, with Rem. Rev. Stat., § 2474 [P.P.C. § 116-133.]. Section 2469, quoted above, makes it a felony for one to "open, conduct, carry on or operate" a gambling game, whereas § 2474 makes it simply a gross misdemeanor for a person to permit certain buildings or structures to be used for gambling. Appellant's position is that the evidence, in so far as it was properly admitted, established only that he had permitted the Keglers club premises to be used for gambling, in violation of § 2474, but not that he had opened, conducted, carried on, or operated a gambling game, in violation of § 2469.

Appellant argues that the trial court demonstrated its confusion in reference to the statute in two ways: (1) by certain of its rulings, and (2) by one of the instructions which it gave.

The rulings complained of consist of certain statements made by the trial court in overruling appellant's challenge to the sufficiency of the evidence at the close of the state's case. During the discussion of that matter, the court made the remark that

". . . he [appellant] is presumed to know what is going on in the establishment that he manages, and he is put to his proof in that regard. He is not only presumed to know what is going on, but he is presumed to be carrying that on, if he is the manager, and even if he merely tolerates it for that purpose."

It will be borne in mind that this statement was made only to counsel during argument, and out of the presence of the jury. It could hardly be said, therefore, that the court was thereby advising the jury of the interpretation to be placed on § 2469.

Moreover, the court continued its statement as above quoted by saying:

"Further, if this goes on for a period of time, *and the house gets a percentage out of it*—although the evidence may be conflicting upon that, and the jury has a right to draw any inference that is warranted by the evidence—then he is presumed to be consenting to it, he is presumed to be

condoning it *if the house gets any percentage out of the game.* Several witnesses testified to the effect that the money *went to the house.* Witnesses testified, also, that in this game when there was a layout man present, that this layout man was a *representative of the house,* and that the money, when the players bet against the layout man, *went to the house.*" (Italics ours.)

We think that, for the purpose of ruling on the challenge, the court might justifiably have gone even further and have stated that the evidence to which it was then referring, together with the evidence concerning appellant's authority and activity as manager of the club, was sufficient to warrant a finding that appellant himself, as manager, was not merely "condoning" the operation of a gambling game on the premises, but was actually, as manager, conducting, carrying on, and operating it.

■ The instruction to which appellant objects in this connection reads:

"Instruction No. 4

"You are instructed it is the law of this state that: 'Every person who shall open, conduct, carry on or operate, whether as owner, manager, agent, dealer, clerk, or employee, and whether for hire or not, any gambling game or game of chance, played with—dice, or any other device, or any scheme or device whereby any money or property or any representative of either, may be bet, wagered or hazarded upon any chance, or any uncertain or contingent event, shall be a common gambler.'

"You are instructed that the game designated in the different counts of the information as '4-5-6 played with dice' is a gambling game or game of chance when money, or any representative thereof is bet, wagered or hazarded upon a chance thereon, within the meaning of the above quoted law.

"You are instructed that the expression 'every person who shall open, conduct, carry on or operate, whether as owner, manager, agent, dealer, clerk, or employee' within the meaning of the above quoted law applies to every person who either opens or conducts, or carries on, or operates, or any one or more thereof, a gambling game or game of chance, *but also applies to every person co-operating or assisting in the operation where such gambling is being carried on, and whether such person actually participates in the gambling*

*game being carried on or not, and whether such person receive any hire therefor or not."*

Appellant excepted to that portion of the instruction which we have italicized "on the ground that such instruction is misleading and confusing to the jury and is not a correct statement of the law as applied to the evidence in this case." In his brief, appellant specifically criticizes that portion of the instruction because of the word "where" therein contained, and argues that, by the use of that word, the court extended the scope of § 2469 to cover every person "co-operating or assisting in the operation" on the premises *where* the gambling was being carried on.

Three answers, we think, may be made to appellant's contention: (1) appellant's exception was insufficient to apprise the court wherein the instruction was misleading or confusing; (2) in our opinion, the italicized part of this instruction, although not altogether as clear as it might be, should be interpreted to mean that the statute applies, not only to everyone who actually opens, conducts, carries on, or operates a gambling game, but also to one who *co-operates or assists in the operation of such game,* whether or not he be at the time participating as a player in the game; and (3) the court definitely and specifically disposed of appellant's present criticism by giving instruction No. 5, the pertinent portions of which we quote:

"You are instructed that the elements essential to a conviction of the crime charged in each count of the information are as follows:

"(1) That on or about the date alleged in the said count a gambling game or game of chance commonly known as '4-5-6' played with dice whereby money or any representative thereof was then and there bet, or wagered, or hazarded upon a chance or uncertain or contingent event, was opened, or carried on, or operated or conducted, or any one or more thereof, in the building known as BPOK Lodge No. 1 or Keglers Club located at East 526 Sprague Avenue in the City of Spokane, Washington.

"(2) That on or about the date alleged in the said count the said defendant, Orien Gross, did wilfully, unlawfully and feloniously, open, or conduct, or carry on, or operate,

or any one or more thereof, the said gambling game or game of chance at the said time and place.

"(3) That at said time and place the said defendant was either the owner, or manager, or agent, or dealer or clerk, or employee of the owner, or any one or more thereof, of the said gambling game.

"If, therefore, the State, as plaintiff, has proved beyond a reasonable doubt each and all of the foregoing elements essential to a conviction, in any one or more of the said counts in the information, it will be your duty to convict the defendant of the crime charged in the count or counts of the information as to which you find the State has proved each and all of the foregoing essential elements. If, on the other hand, you find that the State, as plaintiff, has failed to prove any one or more of the said essential elements in any count or counts contained in the said information, it will be your duty to acquit the defendant of the crime charged in such count or counts of the information as to which the State has failed to prove any one or more of the above stated elements essential to a conviction. . . .

"You are further instructed that participating as a player in the said dice game known as 4-5-6 is not the crime charged against the defendant in the various counts of the information, and if you find that the defendant did so participate in the said game as a player at the times mentioned in the information, this fact, in and of itself, would not be sufficient to warrant your convicting him of the crime charged in the various counts of the information.

"The common gambler statute is not a statute intended to suppress participation in a gambling game, but is intended, rather, to prevent opening, conducting, operating or carrying on gambling games.

"*You are further instructed that even though you find that the defendant acquiesced in, consented to, or had knowledge that, games of 4-5-6 were being played in the Keglers Club, that this would not be sufficient to justify you in returning a verdict of guilty on any of the counts in the information, unless you further find that the defendant opened, conducted, carried on or operated such games either as owner, agent, clerk, and/or employee of such game or games.*" (Italics ours.)

This instruction not only clearly stated the law applicable to the case, but also demonstrated that the trial court was nowise confused as to the meaning and intent of § 2469,

under which appellant was prosecuted. There was no error in giving instruction No. 4.

Appellant next assigns as error the admission in evidence of sixty-one checks written and delivered by the state's principal witness, D. J. MacGillivray, Jr., in payment of gambling losses alleged to have been sustained by him at the Keglers club or else issued for the purpose of obtaining money with which to gamble at that club.

As shown above, the state had charged the appellant with sixteen distinct offenses alleged to have been committed on certain dates specified in the information, and appellant had in turn pleaded not guilty as to each of the charges. To establish the fact that gambling games had been conducted at the club on those dates, as alleged, the state produced the witness MacGillivray, who testified at length that on various dates he was present at the Keglers club, had participated in gambling games which were then conducted on the premises, and had wagered various sums of money in such games. However, the witness was unable to specify, from present recollection or memory, the exact dates of his visits or the exact amounts of money wagered or used by him on those occasions. To establish those facts with certainty, the witness produced sixty-one checks, which he testified were written and delivered by him in payment of gambling losses incurred, or for the purpose of obtaining funds with which to gamble, at the club on the days indicated by the dates appearing on the various checks. The witness stated repeatedly throughout his testimony that he had no independent recollection of the exact dates of those occurrences, but relied solely upon dates as shown by his checks. Over appellant's objection, the checks were admitted in evidence.

Appellant concedes that the checks were usable for the purpose of refreshing the memory of the witness, but contends that it was error to admit the checks in evidence. He bases his contention upon the well-established rule that where a witness, after examining the writing in issue, testifies from his own independent recollection of the facts, the writing may not be introduced as evidence, or read or sub-

mitted to the jury, unless it is relevant and admissible on some other ground.

However, the rule is equally well established that where the witness has no independent recollection of a fact toward which the inquiry is directed, but testifies merely from his knowledge or belief in the accuracy of a memorandum or other writing relating to such fact, it is proper that such writing be put in evidence and allowed to go to the jury as auxiliary to the testimony of the witness or as a statement adopted by him in the course of his testimony.

These correlative rules are expressed in 40 Cyc. 2467, as follows:

"A memorandum or other. writing is not made evidence by being used to refresh the memory of a witness, or by the fact that it would be permissible to use it for such purpose; and if the witness, after examining the writing, testifies from his own independent recollection of the facts, the writing cannot be introduced in evidence or read to the jury. Where, however, a witness has no independent recollection, but testifies merely from his knowledge or belief in the accuracy of the paper, it is proper that such paper should be put in evidence or read to the jury as auxiliary to the witness' testimony or as a statement adopted by him."

A like statement of the rule is set forth in 70 C. J. 598, 600, Witnesses, §§ 770, 771. See, also, 5 Jones, Commentaries on Evidence (2d ed.), 4668 *et seq.*, §§ 2378-2380; 3 Wigmore, Evidence (3d ed.), 64-113, §§ 734-764.

The reason for the rule which permits the admission of the memorandum or writing in evidence when the witness has no independent recollection of the facts contained therein, is well expressed in the case of *Maupin v. Mobridge State Bank*, 38 S. D. 331, 161 N. W. 332:

"In such a case, the oral testimony of the witness would amount to nothing if standing alone, because, after the examination of the memorandum, the witness concedes that his testimony is not a statement of what he then recalls in relation to the subject-matter—not his present recollection of such subject-matter—but that it is a statement of what he now knows in relation to the correctness of the memorandum. To complete such testimony and give it probative value, there must be received in evidence the memorandum,

that which in fact is the only existing evidence of the subject under inquiry."

A few of the cases upholding or recognizing the second branch of the rule as stated above are the following: *Schoborg v. United States*, 264 Fed. 1; *Cohen v. United States*, 36 F. (2d) 461; *In re Messenger* (D. C., Pa. E. D.), 32 F. Supp. 490; *Roll v. Dockery*, 219 Ala. 374, 122 So. 630, 65 A. L. R. 1473; *Kinsey v. State*, 49 Ariz. 201, 65 P. (2d) 1141, 125 A. L. R. 3; *People v. Greenspawn*, 346 Ill. 484, 179 N. E. 98; *People v. Harrison*, 384 Ill. 201, 51 N. E. (2d) 172; *State v. Easter*, 185 Iowa 476, 170 N. W. 748; *Graves v. Boston & Maine R.*, 84 N. H. 225, 149 Atl. 70; *Century Ins. Co., Limited, v. Rice*, 193 Okla. 418, 144 P. (2d) 953.

This court also has recognized this branch of the rule, although, in the particular cases, it was not applied, because of the factual situations there presented.

In *Kirkpatrick v. Collins*, 95 Wash. 399, 163 Pac. 919, the court quoted with approval the statement of the rule as expressed in 40 Cyc. 2467, set forth above. In *State v. Coffey*, 8 Wn. (2d) 504, 112 P. (2d) 989, we stated:

"A diary or other writing is not made evidence by its use to refresh the memory of a witness or by the fact that it would be permissible to use it for such purpose. If the witness after examining the writing *testifies from his own independent recollection of the facts*, the writing may not be introduced as evidence or read or submitted to the jury," (Italics ours.)

from which it is inferable that the rule is different where the witness, after referring to the writing, still has no independent recollection of the facts.

■ The case at bar well illustrates an instance falling within the second branch of the rule. The checks were therefore admissible.

Appellant next assigns as error the refusal of the trial court to give a requested instruction to the effect that the testimony of an accomplice is to be weighed with great care and caution, and that the jury should not convict a defendant upon the uncorroborated testimony of an accomplice unless, after careful examination of such testi-

mony, the jury is satisfied beyond all reasonable doubt of the defendant's guilt.

This instruction was requested upon the theory that if it be conceded that gambling games were conducted as charged in the information, three of the witnesses in the case, Jan Pasquale, Bill Vandouris, and Pete Kondelis, who acted as stick men or layout men on some of the occasions here involved, were accomplices in the conduct and operation of such games, and hence the requested instruction should have been given. These witnesses testified that they acted in the capacities above stated and that in doing so they were working for the appellant.

For the purpose of the argument, we will assume that these witnesses were in fact accomplices and that the requested instruction is substantially correct in form.

It appears to be well-established law in this state that, while a defendant may be convicted on the uncorroborated testimony of an accomplice, provided that all the evidence and circumstances in the case satisfy the honest judgment beyond a reasonable doubt of the defendant's guilt, nevertheless the trial court should carefully caution the jury, in such cases, in the matter of weighing uncorroborated testimony, and should warn it against a conviction on such testimony; and the failure to give such instruction on request, where the testimony is uncorroborated, may constitute reversible error. *State v. Pearson*, 37 Wash. 405, 79 Pac. 985; *State v. Jones*, 53 Wash. 142, 101 Pac. 708; *State v. Engstrom*, 86 Wash. 499, 150 Pac. 1173; *State v. Troiani*, 129 Wash. 228, 224 Pac. 388; *State v. Adelstein*, 152 Wash. 65, 277 Pac. 387; *State v. Bixby*, 27 Wn. (2d) 144, 177 P. (2d) 689.

It is to be noted that this rule requiring the giving of a cautionary instruction applies only where the testimony of an accomplice is uncorroborated, and not where the testimony of such witness is corroborated by other evidence in the case.

It is also the generally established rule that, while the corroborating evidence must be independent of the testimony of the accomplice, it is sufficient if it fairly tends

to connect the accused with the commission of the crime charged; and it is not necessary that the accomplice be corroborated in every part of his testimony. 20 Am. Jur. 1091, Evidence, § 1238; 22 C. J. S. 1394 *et seq.*, Criminal Law, § 812; 2 Wharton's Criminal Evidence (11th ed.) 1264-1272, §§ 752, 753.

"While corroboration must be as to some material fact which will strengthen the testimony of the accomplice, it is not necessary that the accomplice should be corroborated with respect to every material fact as to which he testifies, nor that corroboration should extend to all the elements of the offense, for such a requirement would in effect deny to the testimony of the accomplice any value at all. If he is corroborated as to some material fact or facts tending to connect accused with the crime, this is sufficient to authorize an inference by the jury that he has testified truly even with respect to matters as to which he has not been corroborated, and thus sustain a conviction.

"*The fact that the accomplice is contradicted as to some details* does not preclude consideration of his testimony where he is corroborated as to material facts." 22 C. J. S. 1396, Criminal Law, § 812.

The ultimate fact which the state was required to prove with reference to each count of the information was that appellant, as manager, opened, conducted, carried on, or operated the gambling game specified in the particular count. The accomplice witnesses testified that they helped out in the games and that, in doing so, they were working for the appellant. Their testimony was but evidentiary of the ultimate fact to be established, and, while their testimony tended to prove the ultimate fact, it did not constitute all or the only evidence thereon. There was other evidence which, in our opinion, tended to prove, and from which the jury could have found, that appellant, as manager of the Keglers club, had conducted, carried on, or operated the games in question.

There was evidence that gambling games were repeatedly conducted at the club, in a remote portion of the premises, and with paraphernalia owned and supplied by the club; that appellant had complete charge of the institution, its premises, activities, and employees; that upon his rec-

ommendation all employees were hired and discharged; that appellant was present at most of these games, participated therein, and at times settled disputes which arose among the players; that he notified certain of the participants as to the times when games were to be played; that out of each "pot," or "bank," a certain amount was taken, which the "stick men," or "dealers," retained, and out of which some of the expenses incident to the operation of the games were paid; that the three accomplices, who acted as stick men or layout men, were not members of the club, but were professional gamblers; and that the layout man handled the "house money," and made bets for the house.

In the case of *State v. Adams*, 181 Wash. 222, 43 P. (2d) 1, there was a conviction upon a charge of conducting a gambling game, in violation of Rem. Rev. Stat., § 2469, which is the statute relating to the crime of being a common gambler. One of the questions involved on the appeal in that case was whether the evidence was sufficient to establish the defendants' connection with the operation of the game. Analyzing the evidence and holding it sufficient to establish the disputed fact, this court said:

"Bossie's [one of the defendants] connection with the operation of the gambling games was sufficiently established, as the jury might have found, and obviously did find, from these facts: Gambling had been conducted for a long time, and was in actual progress upon the particular occasion, on premises to which he had immediate access and which he was, at least, privileged to use. The games were conducted in a clandestine manner and place. Resort to the place was had regularly and for the most part through premises over which he had exclusive possession and control. The only other avenues of ingress and egress were also under his control and direction, particularly at night, when the place was most often frequented. Those admitted to the place were under the observation of himself or his employees. It would have been impossible to operate the resort at night unless his premises were used. Some of the paraphernalia, at least, came from his restaurant. He himself took part at times in the games played.

"Proof of proprietorship in the conduct or operation of gambling is not always capable to the point of ocular demonstration or by the direct testimony of witnesses. Nor is it

necessary that the proof go to that extent. All that is required is that the evidence and the circumstances be such that the guilt of the accused may be fairly inferred, under the rule requiring that guilt be established beyond a reasonable doubt."

 The evidence in the case at bar, as summarized above, was, in our opinion, likewise sufficient to establish appellant's connection with the operation of the gambling games, and warranted the jury in finding that his connection therewith was that of a manager conducting them. The evidence was therefore corroborative of the testimony of the accomplices who testified that, in their activities at the games, they were working for appellant. Under that situation, it was not compulsory upon the trial judge to give appellant's requested instruction.

 In his final assignment of error, appellant attributes misconduct on the part of the trial court in taking part in the examination of the state's witnesses, asking improper, leading, and suggestive questions of them, and commenting upon the testimony. We do not think there is any merit in this assignment. The instances of which appellant complains consisted of questions asked by the court in order to rule upon evidence, or because the court had not heard certain answers of the witnesses, and of statements made by the court in explanation of the reasons for its rulings. The record discloses that on frequent occasions the court called counsel to the bench, where discussion was had, out of hearing of the jury, with reference to the examination and cross-examination of various witnesses.

The constitutional inhibition against judicial comment on the evidence (Art. IV, § 16) does not prevent the court from questioning a witness or from giving the reasons for its rulings on the admission or rejection of evidence, where such questions or remarks do not indicate the judge's opinion as to the truth or falsity of any evidence in the case. *State v. Surry,* 23 Wash. 655, 63 Pac. 557; *Miller v. Dumon,* 24 Wash. 648, 64 Pac. 804; *State v. Mann,* 39 Wash. 144, 81 Pac. 561; *Manhattan Bldg. Co. v. Seattle,* 52 Wash. 226, 100 Pac. 330; *Patrick v. Smith,* 75 Wash. 407, 134 Pac. 1076, 48

L. R. A. (N.S.) 740; *State v. Schuman*, 89 Wash. 9, 153 Pac. 1084, Ann. Cas. 1918A, 633; *State v. Hughlett*, 124 Wash. 366, 214 Pac. 841; *Allbin v. Seattle*, 130 Wash. 342, 227 Pac. 322; *State v. Elder*, 130 Wash. 612, 228 Pac. 1016; *State v. Frost*, 134 Wash. 48, 234 Pac. 1021; *State v. Simons*, 172 Wash. 438, 20 P. (2d) 844; *State v. Brown*, 19 Wn. (2d) 195, 142 P. (2d) 257; *Dennis v. McArthur*, 23 Wn. (2d) 33, 158 P. (2d) 644; *State v. Hart*, 26 Wn. (2d) 776, 175 P. (2d) 944.

The record in this case discloses no ground for inference by the jury that the court had expressed any opinion on the evidence. The assignment of misconduct on the part of the trial court is not well taken.

The judgment is affirmed.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.

