MATTER OF BECERRA-MIRANDA

In Exclusion Proceedings

A-13539641

*Decided by Board March 1, and August 18, 1967*

(1) Where respondent, a lawful permanent resident, departed the United States during the pendency of deportation proceedings against him, returning after a 3-day absence in Mexico, a determination of his status upon return to this country may properly be made in exclusion proceedings under section 236, Immigration and Nationality Act, in which the Government bears the burden of proof [*Kwong Hai Chew* v. *Colding*, 344 U.S. 590, and *Kwong Hai Chew* v. *Rogers*, 257 F.2d 606].

(2) A charge of excludability under section 212(a)(31) of the Act that respondent knowingly and for gain assisted aliens to enter the United States in violation of law is not sustained since it has not been established that there was gain, actual or anticipated, where the only evidence on the question of gain consists of statements by three of the aliens involved, which statements were repudiated by the testimony of two of the makers, both as to content and circumstances under which obtained, and there is an absolute denial by respondent of any gain.

EXCLUDABLE: Act of 1952—Section 212(a)(31) [8 U.S.C. 1182(a)(31)]—
Knowingly and for gain assisted aliens to enter the United States in violation of law.

ON BEHALF OF APPLICANT:
Jesus B. Ochoa, Jr., Esquire
1236 Southwest Center
El Paso, Texas, 79901
(Brief submitted)

ON BEHALF OF SERVICE:
R. A. Vielhaber
Appellate Trial Attorney

Jay Segal, Trial Attorney
(Brief submitted)

Charles Gordon
General Counsel

BEFORE THE BOARD

This is an appeal from the order of the special inquiry officer finding applicant excludable on the specified ground and ordering him excluded and deported.

Applicant is a 30-year-old single male alien, native and citizen of Mexico, who was admitted to the United States for permanent resi-

dence on August 5, 1963 at El Paso, Texas. The charge herein arises from a trip to Mexico, which took place in the first days of October 1965, and the applicant's return therefrom to the United States. The following are the facts about which there is no dispute:

On October 4, 1965, in the very early hours of the morning, applicant, driving his 1965 Chevrolet automobile, crossed the border from Mexico into the State of Texas. Shortly thereafter he stopped and picked up several people, and then proceeded to drive toward the town of Tulia, Texas. The car was stopped by United States border patrol inspectors on Carlsbad Highway short of its destination. There were seven people in the car. They were:

Rogelio Becerra-Miranda, the applicant;
Edmundo Becerra-Miranda, brother of the applicant;
Roberto Becerra-Miranda, also known as Roberto Martinez Gonzales, another brother of the applicant;
Javier Miranda, first cousin of the applicant;
Oscar Lascano-Beanes, third cousin of the applicant;
Manuel Macias-Escajeda, from the same town as applicant;
Hector Ortego-Ortero, from the same town as applicant.

The arrest on the highway took place between 3 and 4 a.m. All of the persons in the car were taken back to the border patrol station at El Paso, Texas, where they were questioned. Applicant, after being advised of his rights, declined to make a sworn statement and was thereafter released (Ex. 5, p. 3). Javier Miranda, who was a lawful permanent resident alien, was released (Tr. p. 73) and there is no indication that any statement was ever taken from him. Applicant's two brothers were questioned but neither gave any information (Tr. p. 52) and no statements were taken from them. Three statements in the English language, each containing substantially the same text, were signed and sworn to by the remaining members of the group and are in the record as part of Exhibit 5. Their substance is as follows:

The affiant, together with four other men, of whom two were brothers of the applicant, on October 3, 1965 went to applicant's home in San Ignacio, Mexico. Applicant asked all of them if they had papers to enter the United States legally and they all said they did not. He told them that he would take them to Tulia, Texas where there was work, for $20 each, which they could pay after they started working. He told them to wait at the headgates in San Ignacio on the Mexican side and to cross when they saw his car on the U.S. side. They went to the headgates and waited and then at about 12:30 a.m. waded across the Rio Grande River near Tornillo, Texas, without presenting themselves to any immigration officer for inspection. They met applicant and got into his 1965 yellow Chevrolet and were driven through Ysleta, Texas to the Carlsbad Highway, where they were arrested by immigration officers after a short drive. They had all been told by the applicant earlier in the evening at his home that if they were arrested, they were to tell the immigration officers they had already crossed

and were on the U.S. highway when they were picked up by applicant, by chance and without prearrangement.

The affidavits end with the statement that they were read to affiants in the Spanish language, were true and correct, were made without coercion or threat and without being promised anything by anyone.

A few days after this arrest, a criminal complaint was filed against applicant in the United States District Court in El Paso, charging violation of section 1325 of Title 8 U.S.C. and section 2 of Title 18 U.S.C., in that he had aided and abetted Oscar Lascano-Beanes, an alien (one of the passengers) to elude examination and inspection by immigration officials. Bail was set at $1500 which he apparently could not meet and applicant was detained in the El Paso County jail. All of the others who had been in the car, with the exception of Javier Miranda, were held as material witnesses under bond of $1000, which they could not meet, and were likewise detained in the custody of the United States Marshal. On March 7, 1966 applicant pleaded guilty to the charge and on March 17, 1966 he was sentenced to six months' imprisonment, with sentence suspended and the applicant being placed on probation without supervision for six months. On the face of the Judgment and Order of Probation there is the following:

It is recommended by the court that the defendant not be deported under section 1251, T. 8, U.S.C. Approved: (signed) Mario J. Martinez, Assistant U.S. Attorney.

At the hearing, applicant testified that he remained in El Paso for about two weeks after the criminal proceedings were completed and then went on to California. An order to show cause in deportation proceedings, issued on July 18, 1966, was sent by certified mail to applicant's last address in El Paso, and set the deportation hearing for July 29, 1966. It was received by applicant's aunt, who brought it to applicant's attorney, who then communicated with applicant in Los Angeles by telephone. Applicant was advised that he would have to be in El Paso for the hearing on the date set. He arrived in El Paso on the morning of that day and was advised by his attorney that the hearing had been adjourned. He then crossed into Mexico on July 29, 1966 and when he sought to return on August 1, 1966 was excluded and held for these proceedings.

At the hearing, excludability was contested. Applicant emphatically denied that there had been any element of gain, claiming that he himself was going to Tulia to look for work, that he was taking his two brothers with him, and that the others decided they would like to go also, and joined the brothers. The three statements above mentioned, which had been taken by the Government and which were introduced in evidence as part of Exhibit 5, were the sole evidence on the question

of gain. Two of the persons from whom the statements had been taken, Hector Ortega-Ortero and Oscar Lascano-Beanes, appeared as witnesses for applicant at the hearing. They testified under oath that the applicant had never asked them for money, nor had they ever promised to pay him any, and that they had never told anyone they had. They stated that they had been specifically asked by the border patrol officers whether they had promised to pay any money and had specifically denied it. They stated that they did not know the actual contents of the affidavits, believing them to be confessions that they were in the United States illegally, and that they definitely did not know they contained anything about a promise to pay the applicant. They also testified that the affidavits were not signed until 12 hours after they had been arrested and, during that 12-hour period, until they signed, they were not permitted to sleep and were not given anything to eat. In short, they repudiated the statements not only as to content, but implied that they were signed under duress.

The Government produced as witnesses two border patrol officers. One, J. T. Robinson, stated that he had come on duty at 8 a.m. on the morning of October 4th and had questioned every person in the car (he gave the number of passengers as five instead of six and had no recollection whatever of Javier Miranda). It is his testimony that the statements were prepared by him by asking specific questions of the affiants in Spanish, and then casting the question and answer into one statement in English. Although his memory was vague on many details, he testified that he remembered Hector Ortega-Ortero in particular because "it was a little difficult to bring him around to the statement" (Tr. p. 40, lines 5 and 6). When called upon in cross-examination to explain what he meant, he stated that this particular witness was a liar, who at one point would not even tell the officer his correct name, but that he nevertheless believed Mr. Ortega had told him the truth when he asked Mr. Ortega if he had paid or promised money to applicant and Mr. Ortega said that he had (Tr. pp. 49 and 50).

The other witness, Edward J. Zizik, had nothing whatever to do with the questioning of the aliens or the preparation of the statements but was involved only in reading one of the three English statements, in Spanish, to the person who later signed it, stating that he had been asked to do so by witness Robinson because witness Robinson was very busy.

Both officers, although they admitted the normal procedure in the border patrol was to bring the aliens to the border patrol station and question them until they made a statement before sending them off to detention quarters, were indefinite as to what had happened to these aliens in the four or five hours between the time of their arrest and the

time when these witnesses came on duty. Both were insistent that the aliens had been denied neither sleep or food, but when questioned more particularly had no personal knowledge of either of these facts. Both stated that the aliens had been taken to lunch.

In spite of the fact that both of the Government witnesses had been present when the affidavits were signed and both of their signatures appear on all three statements, neither could remember when the affidavits had been signed. Witness Robinson could not testify with any specificity whatsoever. Witness Zizik finally stated that he believed that it was in the afternoon but that it could have been anywhere between 1 and 5 p.m.

The special inquiry officer stated at page 8 of his opinion:

It is evident that a choice must be made as to whether these witnesses were telling the truth on October 4, 1965 when they executed the affidavits or when they testified during the hearing. I prefer to accept the testimony in their affidavits.

The special inquiry officer then went on to say that although the Service had not established that there was any actual payment to the applicant, he was inadmissible under the Board's decision in *Matter of B—G—*, 8 I. & N. Dec. 182. That case involved a situation where the testimony established rather clearly that the alien had received at least $5 for gasoline for the trip, and that several of the aliens who came with him had promised to pay him additional money if and when they could. It was apparently in reliance upon the ruling in that case, that anticipated gain constitutes gain sufficient to create deportability or excludability under the appropriate section, that the special inquiry officer has found applicant inadmissible here.

Both applicant's counsel and the Government have raised many points in the brief and the reply brief. We consider that only certain of them are relevant and will direct our attention to those.

It is counsel's contention that since proceedings on the instant charge were initially brought against the applicant in deportation and since his departure and stay in Mexico were of very short duration, for the claimed purpose of visiting his mother, that the case comes within the guidelines set down in the case of *Rosenberg v. Fleuti*, 374 U.S. 449, and that applicant is not presently seeking to make an entry. Therefore, the instant proceedings should revert to the original deportation proceedings. The Service reply is that applicant vitiated his lawful permanent resident status by his "previous unlawful act" and further, that he is making an entry because the purpose of his trip to Mexico was to obtain witnesses for the instant proceeding and was, therefore, not within the purview of *Fleuti*. We do not accept the rationale of either. We find, however, that the special inquiry officer was correct

in dismissing counsel's motion to treat these as deportation proceedings. The proceedings are properly held in exclusion. In this particular situation, applicant was first advised of the pendency of proceedings by a telephone call from his attorney, who advised him that he would have to be in El Paso for a hearing on July 29, 1966 in connection with the charge of deportability. It is applicant's own testimony that he had expected proceedings earlier and had remained in El Paso for a period of 15 days after the criminal proceedings were over in anticipation of immigration proceedings. While there is no evidence in the record to show the degree and type of education applicant has had, he appears to be of average intelligence and must be held to the standard of the reasonable man. It is our belief that the reasonable man, being advised that deportation proceedings were pending against him on a charge known to him, and that a hearing had been set, even upon learning that the hearing date had been postponed, would have been put on notice that the continuance and legality of his status in the United States was in question. A departure from the country, for no matter what purpose, under those circumstances could reasonably be assumed to carry with it the possibility that it might change the applicant's status in the United States and his ability to reenter. This situation is considerably different from the casual two-hour visit of Fleuti.

Counsel claims that the applicant was seriously prejudiced because these proceedings were in exclusion and not deportation, arguing that in deportation proceedings the burden would have been upon the Government to establish deportability, whereas in exclusion proceedings the burden was upon the applicant to establish admissibility. It is his further contention that because the proceedings were held in exclusion, the applicant was denied the protection of due process of law. Although he several times cites the case of *Kwong Hai Chew* v. *Colding*, 344 U.S. 590, it would appear that he has overlooked its significance. In that case, it was ruled by the Supreme Court of the United States, that an alien who had previously been lawfully admitted for permanent residence, and who was seeking to make a reentry, was not in the position of a person seeking initial admission, but was to have his status assimilated to that of a resident alien who had not left the United States and was, therefore, entitled to due process of law and to a hearing. In the second *Chew* case, *Kwong Hai Chew* v. *Rogers*, 257 F.2d 606 (D.C. Cir., 1958), the court carried the situation one step further, and declared that not only was the returning resident alien applying for admission entitled to a hearing, but he was entitled to a hearing at which the Government bore the burden of proof. The Government concedes that this is so in its reply brief.

The question here is whether the Government has sustained that

burden. The doubtful element is whether there was gain, actual or anticipated. The Government does not claim there was actual payment, but only a promise to pay. The evidence on that point consists of the three sworn statements introduced as part of Exhibit 5. The validity of those statements is attacked by the testimony of two of the three persons who made them, both as to content and the circumstances under which they were obtained. In addition, there is applicant's testimony, in which there is an absolute denial of gain. It is his statement that he made the trip because he himself wished to look for work at Tulia, Texas, and he was taking his two brothers with him. He testified that the other persons decided that they would like to look for work also, and were there, with his brothers, waiting to be picked up. There is no evidence that any of the passengers paid for, or promised to pay for, gasoline or any of the other expenses of the trip.

We do not concur with the special inquiry officer's preference to accept the aliens' statements in their affidavits over their testimony at the hearing. The record gives no objective support for such a preference. Nor do we consider that it is accurate to state that it is evident the aliens were willing to help applicant to the extent of committing perjury during the hearing. The record likewise fails to support this assertion.

From our reading of the case, we do not find that the Government has made a sufficient showing of gain. Inasmuch as gain is an essential element in the establishment of excludibility, the Government has not borne its burden.

**ORDER:** It is ordered that the decision of the special inquiry officer heretofore made herein be set aside.

*It is further ordered* that the applicant be admitted as a returning resident alien.

### BEFORE THE BOARD

On September 21, 1966, the special inquiry officer rendered his decision in these proceedings, finding applicant excludable as charged and ordering him excluded and deported. Timely appeal was taken and the Service requested oral argument; the Board was advised that applicant could not meet the cost of counsel's appearance for argument, and the Government presented its argument unopposed on December 8, 1966. On March 1, 1967, after careful consideration of the entire record, the briefs on appeal, and the oral argument, the Board rendered its decision sustaining the appeal, finding it had not been established that applicant was excludable as charged, and ordering that he be admitted as a returning resident alien.

The Service moves for reconsideration, urging that the Board vacate its order and reinstate the special inquiry officer's decision order-

364

ing applicant excluded and deported. The moving papers raise no issue that was not taken into consideration in reaching the decision on appeal.

In making our decision, we looked to the rulings handed down by the United States Supreme Court and the Court of Appeals, D.C. Circuit, respectively, in the cases of *Kwong Hai Chew* v. *Colding*, 344 U.S. 590, and *Kwong Hai Chew* v. *Rogers*, 257 F.2d 606. Chew was a seaman who had been lawfully admitted for permanent residence, had family and property ties here and had already applied for naturalization. He sailed foreign on a vessel flying the United States flag, and upon his return had been ordered permanently excluded, without a hearing. His petition for habeas corpus had been dismissed by the District Court, the dismissal being affirmed in the Circuit Court, in reliance upon a 4–3 holding by the Supreme Court that one, Ellen Knauff (citation below), the bride of an American citizen who was seeking to make her first entry into the United States, could properly be excluded without a hearing. In Chew's case, the Supreme Court stated:

Both courts relied upon United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 94 L.Ed. 317, 70 S.Ct. 309. We granted certiorari because of the doubtful applicability of that decision and *the importance of the issue in the administration of the nation's immigration and naturalization program* * * *. (Emphasis supplied.)

\* \* \*

The The case of United States ex rel. Knauff v. Shaughnessy (U.S.), supra, relied upon below is not in point. It relates to the rights of an alien entrant and does not deal with the question of a resident alien's right to be heard. For purposes of his constitutional right to due process, we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States. \* \* \*

The case was reversed and remanded, and when it came before the Court of Appeals of the D.C. Circuit, that court held:

\* \* \* the court has concluded: (1) that the law of this case is that if Chew is to be deprived of his status—a status described in Kwong Hai Chew v. Colding, 344 U.S. 590 at page 596, 73 S.Ct. 472, at page 477, 97 L.Ed. 576, as 'assimilate[d] \* \* \* to that of an alien continuously residing and physically present in the United States'—*the Immigration Service may do so only in proceedings in which the Service is the moving party, and bears the burden of proof* \* \* \*. (Emphasis supplied.)

The Service submits that in applying these criteria to this applicant, who was lawfully admitted to the United States for permanent residence in 1963 and was held for these exclusion proceedings on return from a three-day visit to Mexico in July, 1966, the Board has misinterpreted the *Chew* decisions. It urges that we must restrict the *Chew* holdings to alien seamen lawfully admitted for permanent residence,

who sailed foreign on vessels flying the United States flag, after first having applied for naturalization under Section 307 of the Nationality Act of 1940. The language of the Supreme Court, not only in describing its reason for granting certiorari, but in its repeated references to the rights and status of resident aliens, make it abundantly clear that the decision was intended to reach resident aliens returning from a brief trip abroad, as a class, and Chew as a member of that class, rather than to Chew personally and to such other persons as might find themselves in his exact circumstances. Another recognition of such general applicability is the following:

\* \* \* a resident of the United States cannot captiously be deprived of his constitutional protection when he seeks to reenter after a brief absence.[15] Even if he returned as a crewman[16] or a stowaway[17] he is entitled to an adjudication of his claims in a fair hearing, in proceedings in which the Service is the moving party, and bears the budren of proof.[18]

See also, *I. & N. Reporter*, Vol. 15, No. 4, April 1967, "When Does an Alien Enter the United States?" (Text on burden of proof in exclusion and deportation proceedings, and footnote No. 5.)

We do not regard as persuasive the argument that *United States ex rel. Mezei* v. *Shaughnessy*, 345 U.S. 246 (1953) clearly delimited the scope of *Chew*, for the same reason that the Supreme Court held the *Chew* case to be inapplicable—the facts in Mezei's case drastically differed from those in Chew's.

We adhere to our holding that the applicant, an alien lawfully admitted for permanent residence who was seeking to return from a three-day visit to Mexico, was to have his status assimilated to that of a resident alien who had not left the United States, and was entitled to a hearing at which the Government bore the burden of proof.[1]

The second area of error charged in this motion is the Board's evaluation of the evidence. We do not concur with the Service conten-

---

[15] Chew v. Colding, 344 U.S. 590, 73 S. Ct. 472, 97 L. Ed. 576 (1953). \* \* \*

[16] Id.; Roggenbihl v. Lusby, 116 F. Supp. 315 (Mass. 1953) (previous residence not lawful).

[17] Matter of B., 5 I&N 712 (1954).

[18] Chew v. Rogers, 257 F. 2d 606 (C.A.D.C. 1958).   See also Stacher v. Rosenberg, 216 F. Supp. 511, 514 (S. D. Cal. 1963) in which the court characterized as a 'misapplication of the Act' the use of exclusion procedure in the case of a long-time resident returning from a temporary absence abroad.

Pp. 3–106 and 3–107, *Immigration Law and Procedure*, Gordon and Rosenfield.

[1] In our decision we stated that the Government in its reply brief had conceded the above; on motion it is denied that there was ever such a concession. We had reference to the text of Point No. 4 of the Trial Attorney's Reply Brief of November 2, 1966. However, assuming we have misread the import of the said material, it was never in any sense a controlling factor and was referred to only to show that there appeared to be no disagreement on the point.

tion that there has been sufficient proof of gain, which is the only fact here in issue. The evidence that there was gain, prospective only, was in the form of sworn statements taken from three of the six aliens who had been riding with applicant. Two of those three appeared and testified at the hearing, denying under oath that they had ever promised to pay the applicant anything or ever told anyone that they had made such a promise. They repudiated the sworn statements, denying knowledge of their actual content and claiming that they had been signed under duress. Applicant at the exclusion hearing denied under oath that he had ever been paid anything or promised payment.

The Government presented as its witnesses two border patrol officers who, not having been parties to the arrangements made with applicant, could not testify on the question of gain, but only on the contents of the repudiated statements and the circumstances under which they had been made. The officer who had actually prepared the statements was vague on many details, although he remembered one of the witnesses in particular because "it was a little difficult to bring him around to the statement," explaining on cross-examination that he meant the witness was a liar, but he believed him to be truthful when he allegedly stated that he had promised to pay the applicant. This border patrol officer, aware that the aliens were claiming they had been held for 12–14 hours without food or sleep before the statements were signed, claimed he could not even make a guess as to what part of the day the aliens had signed the statements, although they were signed before him. The other officer, although he had no part in taking or preparing the statements but had merely translated one into Spanish to the alien who had then signed it, was able to remember that the statements had been signed in the afternoon, at some time between 1 and 5 P.M. Both officers had no knowledge of what had happened to these aliens between their apprehension at 3 or 4 A.M. and the time when these officers came on duty, but admitted that it was customary to question aliens until they made a statement, before sending them on to detention quarters. Both were insistent that the aliens had not been denied either sleep or food, but on questioning it was apparent that they had no personal knowledge of this.

After careful consideration of the entire record, we held in our decision of March 1, 1967:

> From our reading of the case, we do not find that the Government has made a sufficient showing of gain. Inasmuch as gain is an essential element in the establishment of excludability, the Government has not borne its burden.

Nothing contained in the moving papers warrants a contrary finding. The analysis of the testimony do not compel the interpretations urged in the motion, and do not make the facts add up to a stronger show-

ing than that found by the special inquiry officer. The Board is not bound by the special inquiry officer's findings, and can make its own independent determination of both the facts and the law. *Matter of B—*, 7 I. & N. Dec. 1. We did so here for the reasons set out in our decision on the appeal. We have not now been persuaded that we were in error.

For all of the foregoing reasons, we find no merit in the motion and the same will be denied.

**ORDER:** It is ordered that the instant motion be and the same is hereby denied.